Plaintiff fell hard on her buttocks when the chair she was sitting on suddenly collapsed as she attempted to adjust it, and her low back was injured. Rather than getting better over the succeeding weeks or months, she began to develop neurological symptoms suggesting problems in her nervous system above the lumbar area. Her orthopedist referred her for evaluation to a neurologist and a neuroradiologist, the defendants had her evaluated by two other neurologists, and she finally selected a fourth neurologist to treat her after defendants ceased paying compensation. Some 350 pages of their expert medical testimony appears in this record as a result of defendants' theory that plaintiff's continuing disability resulted from multiple sclerosis or some other neurological disease process, and that this was unrelated to the injury.
 When a preexisting, nondisabling, non-job-related condition is aggravated or accelerated by an accidental injury arising out of and in the course of employment or by an occupational disease so that disability results, then the employer must compensate the employee for the entire resulting disability even though it would not have disabled a normal person to that extent. On the other hand, when a preexisting, nondisabling, non-job-related disease or infirmity eventually causes an incapacity for work without any aggravation or acceleration of it by a compensable accident or by an occupational disease, the resulting incapacity so caused is not compensable. . . . (Emphasis added.)
Harrell v. J.P. Stevens Company, 54 N.C. App. 582, 587,284 S.E.2d 343 (1981).
There is certainly opinion evidence of a parallel neurological condition that was neither caused, aggravated, or accelerated by the traumatic injury, particularly in the testimony of Dr. Hurwitz, who opined that a fall such as plaintiff's is not violent enough to cause spinal cord damage. He was contradicted by physicians who regularly treat traumatic injuries of the spine. But finally, the coincidence of accident and disability — evidence powerful enough to substitute for medical opinion in simpler cases (see, e.g., Click v. Pilot Freight Carriers, Inc., 300 N.C. 164,168-69, 265 S.E.2d 389 (1980)) — persuades that the traumatic fall caused some injury to the spinal cord or above, causing or accelerating neurological problems, as best explained by Dr. Pearce. Depo. of Dr. Pearce, pp. 44.
Defendants initially admitted liability by reason of the accident and entered into a Form 21 agreement for payment of compensation during her total disability. The Commission has never determined or allowed termination of benefits on the grounds that this period of disability has ended. It clearly had not at the time of the hearing. Depo. of Dr. Hurwitz, p. 50; Depo. of Dr. Pearce, pps. 47-50. A Form 24 was approved on January 31, 1994 suspending benefits for failure of the plaintiff to attend a medical examination with Dr. Hurwitz. The grounds offered by the defendants suggest that plaintiff was refusing treatment in violation of N.C.G.S. § 97-25, although the appointment with Dr. Hurwitz was for an examination pursuant to N.C.G.S. § 97-27. The unreasonable resistance to a Commission order to do either carries the same result: suspension while the refusal continues.Sanhueza v. Liberty Steel Erectors, N.C. App. No. COA 95-468, 4 June 1996; Hooks v. Eastway Mills, Inc., 74 N.C. App. 432, 435,328 S.E.2d 602, rev.'d on other grounds, 314 N.C. 657, 658-59,335 S.E.2d 898 (1985); Owens v. Wickes/Collins Aikman Corp., I.C. No. 936154, 1 February 1993. Dr. Hurwitz did finally see the plaintiff on February 21, 1994 (at her expense), and wrote in his report that he had a note from the carrier requesting the evaluation, and sent a copy of the report to the carrier. Yet benefit payments did not resume, then or since. When payment of benefits were not resumed and no other grounds for termination were presented to the Commission, plaintiff's counsel moved the Commission's claims supervisor to order reinstatement of benefits. The Form 24 was initially granted because plaintiff's counsel had responded to the examination request with a written refusal, then resisted the Form 24 based on defendants' failure to make financial arrangements for the trip before the appointment was canceled, then argued with the claims examiner about the timeliness of his response (which she considered on its merits at that point, if not before). A request for hearing (Form 33) and response had been filed prior to the reinstatement motion, the parties both argued the merits case in their submissions, and defendants opposed reinstatement on the ground that all issues needed to resolved together at a full evidentiary hearing. At that time, the Commission did not have the personnel to offer expedited or informal telephonic hearings on termination issues (since explicitly authorized by N.C.G.S. § 97-18.1). In this murky situation, the motion for reinstatement was improvidently deferred to the hearing Deputy Commissioner.
This decision upholds an award of benefits over the insurer's appeal, and thus it is within the Commission's discretion to award a reasonable attorney's fee to the plaintiff pursuant to N.C.G.S. § 97-88. Harwell v. Thread, 78 N.C. App. 437, 337 S.E.2d 112
(1985). The Commission has typically awarded fees under this provision when poor grounds are offered for an appeal that works a great imposition on the plaintiff.
Legally, the carrier should have reinstated benefits when the plaintiff complied with its request to see Dr. Hurwitz, without a ruling by the Commission. Once the basis for the suspension of benefits ended, the standing award (the approved Form 21) required payment until the parties agreed or the Commission found that total disability had ended. In addition, defendants were not, in fact, at risk of paying compensation not attributable to the compensable accident. Information from Drs. Nesbit and Loomis, long before the Form 24 was granted, indicated that the plaintiff was actually disabled by results of the fall, whether or not she also had multiple sclerosis (MS), or other emerging neurological problems. Any serious attempt to delineate a point at which plaintiff was disabled solely by the latter would have led all but the most dogmatic minority to the conclusion that the neurological problems were triggered by the fall. And once they were apparent, sorting out the precise nature and cause of these symptoms had no implications for treatment.
In his evaluation, done at defendants' request, Dr. Nesbit concluded that he was "uncertain whether there are valid neurologic deficits of right lower extremity other than dysfunction secondary to fibrositis." He felt that an understanding of the neurological problem would be necessary before physical therapy for the injuries that resulted from the fall, but foresaw a 5% permanent partial disability from the more apparent injuries to the back muscles and other tissues. The patient notes of both Dr. Guthrie and Dr. Nesbit indicated that these were the immediate cause of her disability shortly after the fall, and even Dr. Hurwitz did not purport to deny that when he saw her nearly two years later. The sense of Dr. Nesbit's deposition testimony on October 26, 1994 was that plaintiff's disability began with her fall. Dr. Nesbit opined that the traumatic accident caused sacroiliac injuries affecting plaintiff's ability to walk (p. 19), that it was "highly probable" that she suffered injury to the piriformis muscle in the fall, and that dysfunction of the iliacus muscle was possibly caused directly by the trauma, and more likely by resulting "indirect injury" "from disuse, resulting from the back injury" (p. 23). MS became an issue only because of signs or symptoms which he could not comfortably explain from the low back injuries: a neurogenic bladder, "increase muscle tone, clonus at the right ankle, and right Babinski sign", including "rhythmic jerking several times a second after sudden stretch of a muscle" in the right leg. In his deposition, Dr. Nesbit testified:
Q: And what was your initial impression?
 A: I thought that she had what I term fibrositis of the low back and right lower extremity. Fibrositis may be described as chronic strain that has not healed, chronic unhealed strain resulting from the fall.
 And I also noted some impaired function of the right lower extremity. And based on my exam that first day, I could not determine whether it was all a result of the fibrositis; there might be some underlying neurological impairment.
 Q: The fibrositis, would that be related to the muscle or the actual bony spine? Or what would that be related to?
 A: Soft tissue, muscle, and connective tissue, ligaments and tendons and the tissues that hold joints together.
 Q: Could you then relate back the neurological problems that you were detecting or suspecting with the right leg to the fibrositis?
 A: I thought that might possibly — might reasonably be due to the fibrositis, but I wasn't sure that there was not something else interfering with function. (pps. 7-8)
 Q: Would your testimony be then that she did suffer some sort of soft tissue strain injury as a result of the March, 1992 accident?
A: Yes.
 Q: And would it be fair to say that as of the last time you saw Mrs. Rush, that strain that she suffered as a result of the March, 1992 fall was not completely resolved?
 A: That was my impression. That's fair to say that.
 Q: Would you disagree with Dr. Guthrie, the orthopedist's opinion, the opinion that she suffered a sacroiliac joint strain or injury in the March, 1992 injury?
A: I would not.
 Q: Would you agree that sacroiliac joint injuries can result in low back pain in the area of the pelvis?
A: I agree.
 Q: Can sacroiliac injuries such as Mrs. Rush suffered as a result of the March, 1992 accident at work cause some difficulty in the ability to walk?
A: Yes. (pps. 18-19)
 Q: If Mrs. Rush had some underlying neurological condition that was not caused by the March, 1992 accident, would it be fair to say that the consequences of the March, 1992 accident have added to a preexisting disability, dysfunction, or impairment?
MS. ROOT: Objection to form.
 A: It could be fair to say that if we knew there was a preexisting condition. But I have no evidence one way or the other to help me with that.
 Q: So, at this point, we can't really say that she had a preexisting neurological disorder; is that right?
A: I can't say that.
 Q: I take it, by the same token, there's no way to say when, if ever, Mrs. Rush would have been disabled as a result of this underlying neurological disorder, if in fact she has one?
A: I agree with that. (pps. 26-27)
When Dr. Hurwitz was asked about plaintiff's ability to function as a nurse immediately prior to the fall (including over seven hours a day on her feet, according to her testimony), he did not deny that the trauma of the fall was disabling, and insisted only that the deficiencies he was measuring in 1994 were a result of "upper motor neuron disease or dysfunction."
Dr. Loomis indicated that the neurological disease did not require a change in treatment. As he summarized in his letter of December 31, 1993 to the plaintiff:
 I am not aware of anything at this point that could be done neurosurgically to help you with your problem. *** I cannot suggest any type of therapy at this point that would be beneficial.
Dr. Pearce's testimony also indicated that he did not believe further testing was imperative because a determination of whether or not the plaintiff had multiple sclerosis (MS) would not have an impact on treatment. Depo. of Dr. Pearce, p. 39. After defendant's moved to have plaintiff undergo a spinal tap, Dr. Pearce wrote a letter, addressed to the Commission's Chairman, stating that such a test was "medically unwarranted".
Clearly, the defendants rationalized their violation of the Form 21 on the ground that plaintiff was disabled by an non-work-related neurological condition, and later with the demand for a spinal tap to test for it, but this position was never presented to the Commission on a Form 24, or even on their Form 33R response to plaintiff's request for hearing. Tr. pps. 151-52. Had their agents analyzed their medical evidence with the same energy with which they obtained it, plaintiff would have had no need for counsel. Instead, there appears to have been a disingenuous focus on justifying termination of benefits, perhaps as plaintiff suggests, with the idea that Drs. Nesbit and Hurwitz would reprise their similar roles in Ballenger v. BurrisIndustries, 66 N.C. App. 556, 311 S.E.2d 881 (1984).
We have considered the plaintiff's Motion for Sanctions dated January 10, 1995 and conclude that it should be denied, except for allegations of misconduct attributed to defense counsel, which would not fairly be imputable to defendants to a degree that would justify greater sanctions than the award of plaintiff's attorney's fee, and these are deferred for later resolution.
Upon review of all of the competent evidence of record, with reference to the errors assigned, and finding no good ground to reconsider the evidence, receive further evidence, or rehear the parties or their representatives, the Full Commission MODIFIES and AFFIRMS the Opinion and Award of the Deputy Commissioner as follows:
The following were entered into by the parties at the hearing before the Deputy Commissioner as
STIPULATIONS
1. On the date of the alleged injury giving rise to this claim, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At such times the employee-employer relationship existed between plaintiff and defendant-employer.
3. At such times, Wausau Insurance Companies was the carrier on risk.
4. The date of the alleged injury is March 23, 1992.
* * * * * * * * * * * * *
Based upon all the competent credible evidence of record, the Full Commission makes the following additional
FINDINGS OF FACT
1. As of March 23, 1992, plaintiff was employed with the defendant-employer, earning an average weekly wage of $465.93, which yields a compensation rate of $310.62. Her work as a Licensed Practical Nurse (LPN) required her to be on her feet for 7 hours out of a 8 1/2 shift. She performed this job without difficulty prior to March 23, 1992.
2. On March 23, 1992, plaintiff suffered an injury by accident in the course and scope of her employment with the defendant when she attempted to adjust a chair on which she was sitting, which collapsed suddenly causing her to fall 20 to 36 inches onto her buttocks in a sitting position. As a result of the accident, plaintiff suffered a right sacroiliac strain or sprain and associated piriformis syndrome and probable spinal cord contusion, resulting in instability and weakness of her right leg, ankle and foot.
3. Subsequently, plaintiff undertook to work as an LPN with another employer, Aston Park Health Center, with whom plaintiff had interviewed prior to the accidental injury. Plaintiff initially attended a few days of her new employer's planned two-week orientation training, but resigned on April 2, 1992 due to pain, weakness and falling due to weakness in her right leg that began approximately six days after the injury by accident.
4. After initially receiving care from a family practitioner, Dr. Wade Grainger, plaintiff's care was transferred to an orthopedist, Dr. Todd Guthrie. Dr. Guthrie saw plaintiff May 7, 1992 through late September, 1993. As of the latter date, she continued to suffer from pain and weakness and a degree of permanent partial impairment that he opined would prohibit her from carrying out either sedentary or ambulatory functions of a nurse. He believe these conditions were attributable to plaintiff's traumatic injury.
5. Plaintiff continued to have health problems, including problems falling. Plaintiff's health care professionals all initially related plaintiff's problems to the accidental injury of March 23, 1992.
6. The parties executed a Form No. 21 agreement for temporary total benefits during disability, which was approved by the North Carolina Industrial Commission on May 15, 1992.
7. At the hearing in this matter, plaintiff described symptoms including difficulty walking, frequent falling, urinary incontinence, occasional bowel incontinence, and more recently, problems with double vision. As a result of plaintiff's complaints of incontinence on May 12, 1992, Dr. Guthrie referred her to a urologist, Dr. Kraebber. Following a course of physical therapy, during which problems with her right leg giving away persisted, and insensitivity to vibration in her right foot was detected, Dr. Guthrie referred plaintiff for a neurological evaluation with Dr. Loomis.
8. Dr. Colin Thomas saw the plaintiff for her bladder problems from August 17, 1989 through September 22, 1994. With the benefit of his own records and those of Dr. Kraebber from May and June, 1992, he testified that her condition was essentially the same as prior to the injury, although use of medication, psychological stress or injury could cause symptoms to vary.
9. Plaintiff was referred by the rehabilitation nurse hired by the defendants, Joanne Hartley, for examination by Dr. Michael Nesbit, a neurologist and director of the Chronic Pain Rehabilitation Program, in Charlotte. At that time, plaintiff complained of low back pain, pain and weakness in her right leg, urinary incontinence, and poor bowel control. He diagnosed fibrositis, or chronic unhealed back strain resulting from her compensable fall. After examining plaintiff on February 3, 1993, Dr. Nesbit recommended a rehabilitation program to restore strength and function.
10. Although Dr. Nesbit diagnosed fibrositis, and agreed that sacroiliac injuries from the March, 1992 accident would explain plaintiff's difficulty walking due to a strain which had not healed and become chronic, Dr. Nesbit and the team at Rehab Advantage began to identify symptoms in the first week of their care in February of 1993 which he found indicative of a "disease of the central nervous system [,] as opposed to peripheral nerve or muscle", being changed "muscle tone, clonus at the right ankle, and right Babinski sign", an abnormal reflex. This conclusion was supported in part by his opinion that it was not reasonable to assume a direct injury to the iliacus muscle from the sort of fall suffered by the plaintiff, "although possible". He did agree that it was "highly probable" that Dr. Guthrie was correct in diagnosing an injury to the piriformis muscle. He did not disagree with Dr. Parsons' findings, but did not feel that they conclusively contradicted his diagnosis. Dr. Nesbit opined that there was no medical evidence that plaintiff had a neurological disorder, such as MS, that preexisted the fall, or indicative of when, if ever, the claimant would have been disabled as a result of the neurological disorder he diagnosed.
11. As a result of the neurological findings, Dr. Nesbit ordered certain testing, including an MRI scan of the brain. It was performed by Dr. R. Gregory Parsons, a neuroradiologist, on February 10, 1993 to determine the probability of whether the plaintiff had multiple sclerosis, structuring the exam in light of reported weakness in the right lower extremity, frequent falls, and low back pain for eleven months. He determined that Ms. Rush did not have signs or findings present in at least 85% of MS patients. After receiving Dr. Hurwitz's report that he observed "subtle but definite . . . changes" in these films, Dr. Parsons re-evaluated them with three other senior neuroradiologist, and concluded that the films did not show anything that would even raise a question or suspicion of abnormality. He did not observe signs of brain lesions that cause visual problems in MS suffers. Dr. Parsons stated that a diagnosis of MS in most people is determined or confirmed by an accumulation of clinical findings and evaluations of spinal fluid.
12. After receiving the negative MRI results, Dr. Nesbit scheduled the plaintiff for a spinal tap for February 17, 1993. Based on reports that Mrs. Rush called in sick on the 15th, was seen in Dr. Guthrie's office on the 16th sick with diarrhea, and that plaintiff was instructed by Dr. Guthrie not to return to Rehab Advantage, Dr. Nesbit discharged her from the program on February 17, 1993.
13. Plaintiff was requested by defendants to attend an examination by Dr. Barrie Hurwitz, an associate professor of neurology at Duke University Medical School. Plaintiff failed to keep the initial appointment, and did not agree to attend or offer reasonable grounds for declining after the Commission's order of January 14, 1994 to do so, and defendant's Form 24 motion to suspend payment of temporary total disability benefits was approved on January 31, 1994.
14. Thereafter, on March 11, 1994, plaintiff presented to Dr. Hurwitz and was examined by him at defendants' request, but plaintiff bore the expense. However, defendants have not resumed payment of benefits.
15. Upon examining plaintiff and reviewing plaintiff's medical records and test results, including the MRI scan of the brain, Dr. Hurwitz, who has had a special interest in multiple sclerosis for the last eight to ten years, arrived at the conclusion that the plaintiff was most likely suffering from an upper motor neuron disorder, perhaps multiple sclerosis.
16. Dr. Hurwitz recommended a spinal tap, a test capable of confirming a diagnosis of multiple sclerosis, but not excluding it. However, this test is neither medically necessary, nor required to determine either the cause, in the legal sense, of plaintiff's disability, nor needed to determine appropriate medical treatment.
17. Prior to the hearing before the deputy commissioner, plaintiff came under the care of Dr. Larry Pearce, Clinical Associate Professor of Neurology at Bowman Gray School of Medicine, with a neurological practice in Mocksville. In the opinion of Dr. Pearce, a neurological disorder or disease process was caused or triggered by the trauma of March 23, 1992. The medical compensation services rendered by Dr. Pearce were reasonably necessary to provide the plaintiff relief, within the meaning of N.C.G.S. § 97-2 (19), under the circumstances of this case. Plaintiff timely moved the Commission for approval of Dr. Pearce as her treating physician. In that Dr. Pearce is qualified to treat the plaintiff's condition, his proposed therapy is consistent with the evaluations of the other physicians who have seen plaintiff, and the plaintiff has confidence in him, the plaintiff is entitled to choose Dr. Pearce to assume the care and charge of her case.
18. The plaintiff's accidental fall on March 23, 1994 caused traumatic injuries of the low back, and caused, precipitated, accelerated or exacerbated an upper motor neuron disorder. As a result of these conditions, plaintiff has been incapable of performing the duties of her former employment as a nurse or earning wages in any other capacity since April 2, 1992.
19. The parties' Form 21 Agreement was not entered into in error due to fraud, misrepresentation, undue influence or mutual mistake.
20. The fee agreement with his client presented by counsel for the plaintiff, providing for a contingent fee of 25% of the indemnity or cash proceeds of this award, being the customary fee for similar services, is reasonable in light of the record herein and the time invested, amount in controversy, results achieved, contingent nature of the contract, skill required and nature of the attorney's services.
* * * * * * * * * * * *
Based on the foregoing findings of fact, the Full Commission makes the following additional
CONCLUSIONS OF LAW
1. As a consequence of her injury by accident in the course and scope of her employment with the defendant, plaintiff is entitled to compensation at the rate of $310.62 per week from and after April 2, 1992, through the date of the hearing before the Deputy Commissioner, and during her continuing disability, subject to credit for compensation heretofore paid. N.C.G.S. § 97-29.
2. Plaintiff is entitled to medical compensation as a result of the injury to her back, including the upper motor neuron condition, as reasonably necessary to effect a cure, give relief or shorten the period of resulting disability. N.C.G.S. §§ 97-25;97-2 (19). Plaintiff is entitled to refund of fees of Dr. Hurwitz and a mileage reimbursement for travel to see him, together with a 10% late payment penalty. N.C.G.S. §§ 97-25; 97-2 (21); 97-18 (i);97-90 (e); I.C. Rule 407 (2).
3. Upon plaintiff's timely motion, and in the Commission's discretion, she is entitled to approval of Dr. Pearce to assume the care and charge of her case. N.C.G.S. § 97-25; Forrest v. PittCo. Board of Education, 100 N.C. App. 119, 127, 394 S.E.2d 559
(1990); Davis v. City of Charlotte, I.C. No. 865291, 8 March 1991.
4. Plaintiff is entitled to a penalty of 10% of all payments of compensation which have come, due pursuant to the Form 21 Agreement, on and after March 11, 1994, and remained unpaid for more than 14 days. N.C.G.S. § 97-18 (g).
5. Plaintiff is entitled to recover from the defendants, as a portion of the costs, the reasonable attorney fee incurred in the prosecution of this claim upon entry of this award to pay compensation following the insurer's hearing on review before the Full Commission. N.C.G.S. §§ 97-88; 97-90 (c).
6. Defendants have failed to show that the Form 21 Agreement was entered into in error due to fraud, misrepresentation, undue influence or mutual mistake, and the motion to set it aside must be denied. N.C.G.S. § 97-17.
* * * * * * * * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission enters the following
AWARD
1. Defendants shall pay plaintiff compensation at the rate of $310.62 per week for the period April 2, 1992 through January 31, 1994, and from March 11, 1994, through the date of the hearing before the Deputy Commissioner, and continuing until further orders of the Commission, together with a 10% penalty on all sums coming due after March 11, 1994 and unpaid for 14 days, subject to the attorney's fee hereinafter approved. Defendants shall pay interest thereon at the judgment rate to the plaintiff. N.C.G.S. § 97-86.2. So much of said compensation as has accrued shall be paid in a lump sum.
2. Defendants shall pay plaintiff's bills for medical compensation when the same have been approved in accordance with the rules of the Commission, including those heretofore incurred with Drs. Pearce and Hurwitz, together with a 10% penalty on the latter.
3. Dr. Larry A. Pearce is APPROVED to assume the medical care and charge of the plaintiff's case and compensable conditions.
4. Plaintiff's counsel is entitled to a reasonable attorney fee, in accordance with his contract, equal to 25% of the sums awarded in paragraph 1 hereof, excluding interest. Defendants shall pay said reasonable attorney's fee directly to plaintiff's counsel, as a part of the costs, in a lump sum equal to 25% of the accrued compensation and penalty due plaintiff, and hereafter, checks equal to one week's compensation simultaneously with the payment of each fourth future week of compensation to the plaintiff, without reducing compensation paid to plaintiff.
5. Defendants shall pay the costs due this Commission.
6. Defendants' Motion to compel plaintiff to undergo a spinal tap is DENIED, without prejudice to her treating physician's future recommendations, and the Deputy Commissioner's order of August 16, 1995 is VACATED.
7. Defendants' Motion to Set Aside the parties Form 21 Agreement approved May 15, 1992 is DENIED.
8. Plaintiff's Motion for Sanctions dated January 10, 1995 is otherwise DENIED, as against the defendants, and DEFERRED as to defendants' counsel of record.
 S/ ___________________________ J. RANDOLPH WARD COMMISSIONER
CONCURRING:
S/ _______________________ J. HOWARD BUNN, JR. CHAIRMAN
S/ _______________________ LAURA K. MAVRETIC COMMISSIONER
JRW:md