JOHNNY W. BALLENGER v. BURRIS INDUSTRIES, INC. AND ST. PAUL FIRE
AND MARINE INSURANCE COMPANY

No. 8210IC1177

(Filed 21 February 1984)

**1. Master and Servant § 93.3— deposition of doctor—no formal introduction into evidence**

A doctor's deposition was of record in a workers' compensation case, although it was not formally introduced into evidence, where defense counsel indicated at the conclusion of the initial hearing that they wished to take the doctor's testimony at Duke University Medical Center; the hearing commissioner gave the parties 60 days in which to depose the doctor; and once the doctor's deposition was completed, the original transcript was forwarded to the hearing commissioner by the court reporter, with a copy sent to each attorney. Industrial Commission Rule XXA.

**2. Master and Servant § 93.2— workers' compensation—additional deposition testimony—objections and motions to strike—ruling by hearing commissioner**

It is incumbent upon the party wishing to exercise his reserved right to object or move to strike additional deposition testimony to request the hearing commissioner to rule on the specific deposition questions and answers which the party finds objectionable, with the grounds upon which the objection is taken clearly stated, and the hearing commissioner, in turn, must formally enter his or her ruling into the record before an award.

**3. Master and Servant § 93.2— workers' compensation—ruling on objections to deposition testimony**

A hearing commissioner sufficiently ruled on plaintiff's objections to additional deposition testimony where a note containing the ruling was stapled to the deposition.

**4. Evidence § 50— opinion by expert medical witness—information supplied by others**

An expert medical witness may give his opinion, including a diagnosis, based either on personal knowledge or observation or on information supplied him by others, including the patient, if such information is inherently reliable, even though it is not independently admissible into evidence. If his opinion is admissible, the expert may testify to the information he relied on in forming his opinion for the purpose of showing the basis thereof.

**5. Evidence § 50.2; Master and Servant § 93.3— workers' compensation—medical testimony incompetent on question of causation**

A physician's "educated guess" that plaintiff would have deteriorated from his degenerative nerve disease at about the same time regardless of his compensable work-related injury was incompetent as expert opinion evidence on causation.

**6. Master and Servant § 67.3— workers' compensation—aggravation or accelera-
tion of preexisting condition—insufficient evidence to support finding**

    The evidence in a workers' compensation proceeding was insufficient to
support a determination by the Industrial Commission that plaintiff's preex-
isting hereditary degenerative nerve disease was not aggravated or ac-
celerated by a compensable work-related fracture of his leg and the resulting
inactivity while his leg was in a cast for some seven months, and the cause
must be remanded for appropriate findings and conclusions where there was
evidence to support a contrary determination.

    APPEAL by claimant from the North Carolina Industrial Com-
mission. Opinion and award entered 29 September 1982. Heard in
the Court of Appeals 28 September 1983.

    On 21 September 1979 claimant, Johnny W. Ballenger, was in-
jured when he slipped and fell on the defendant employer's
premises in the course of his work as a furniture upholsterer for
Burris Industries, Inc. The fall caused claimant to break his left
leg. The claim was accepted as compensable by the defendant car-
rier, and workers' compensation benefits were paid to claimant
for temporary total disability during the seven month period he
was confined to a leg cast.

    Claimant suffers from a hereditary degenerative nerve
disorder, diagnosed as Charcot-Marie-Tooth disease. The disease
causes muscular atrophy which is essentially irreversible. In the
several months following removal of his leg cast in April, 1980,
claimant developed weakness in his legs, low back pain and then
weakness in his hands. By 21 September 1980, claimant had suf-
fered moderately severe muscle wasting of his trunk and all four
extremities. As a result, claimant has become totally disabled.
Prior to his accidental injury in September, 1979, claimant's nerve
disease did not lessen or diminish in any way his ability to per-
form his job during the 23 years that he was employed by Burris
Industries, Inc.

    A hearing was held before the Industrial Commission in
December, 1981, to determine whether claimant was entitled to
compensation for permanent and total disability under G.S. 97-29.
At the conclusion of the hearing, Deputy Commissioner Scott
ordered the deposition of two additional medical witnesses. Based
upon the hearing and deposition testimony, Deputy Commissioner
Scott made certain findings and conclusions to the effect that

claimant's disability was caused by his Charcot-Marie-Tooth disease and that his disease was neither caused by nor aggravated by his fracture and subsequent inactivity during convalescence. Accordingly, only an award for 5% permanent partial disability to the claimant's leg resulting from the fracture was entered.

The claimant appealed to the Full Commission. With one commissioner dissenting, a majority of the Full Commission adopted as its own the findings of fact, conclusions of law, and award of the Deputy Commissioner. Claimant appeals from the denial of his claim from permanent and total disability.

*Whitesides, Robinson and Blue, by Henry M. Whitesides, for plaintiff appellant.*

*Hedrick, Feerick, Eatman, Gardner & Kincheloe, by Mel J. Garofalo, for defendant appellees.*

JOHNSON, Judge.

The various questions claimant has presented for review concern whether the Industrial Commission erred in finding and concluding that the claimant's preexisting condition was not aggravated or accelerated by his compensable accidental injury and subsequent convalescence, and consequently that his disability was entirely caused by his nerve disease. For the reasons set forth below, we hold that the crucial findings of fact on the lack of causal relation between claimant's disability and the industrial accident are not supported by any sufficient competent evidence of record, and therefore may not serve as the basis for denial of workers' compensation benefits to the claimant.

After hearing evidence for claimant and defendants, Deputy Commissioner Scott concluded that claimant's "preexisting degenerative nerve disease was neither caused by nor aggravated by the injury by accident on September 21, 1979 or the resulting inactivity while his leg was in a cast." This conclusion was based in part on the following summarized factual findings to which no exception has been taken: Plaintiff was 47 years old on 21 June 1981. He began working for defendant employer, a furniture manufacturing company in 1957. In September, 1979, plaintiff's duties included upholstering furniture, a job that required him to

stand and use his hands and arms a great deal. He was also quite active at home, reupholstered furniture an additional ten to fifteen hours per week for individuals, grew vegetables in his greenhouse to sell, and kept up a five-acre garden.

On 21 September 1979, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant employer when he fell at work and fractured his left tibia. Dr. Sanders (an orthopedic surgeon) saw him in the emergency room and placed his left leg in a cast. Plaintiff had to use crutches and to keep his weight off his left leg until he was given a shortleg walking cast. On 11 February 1980, he was advised to resume weight bearing. His cast was removed on 28 April 1980.

During the next few months, plaintiff developed weakness in his legs, low back pain and then weakness in his hands. Dr. Sanders recommended a leg brace and physical therapy. By August, 1980, plaintiff was complaining of increasing weakness throughout his body. Dr. Sanders referred him to Dr. Nesbit, a neurologist.

Based upon Dr. Nesbit's deposition, the Deputy Commissioner made the following finding of fact:

4. Dr. Nesbit examined plaintiff on September 21, 1979 and found him to have moderately severe muscle wasting of his trunk and extremities. He diagnosed plaintiff's condition as chronic peripheral neuropathy of uncertain cause. He was unable to determine the cause of plaintiff's condition and in that plaintiff was totally disabled after having previously been fully functional, Dr. Nesbit referred him to Dr. Hurwitz at Duke University Medical Center for a complete evaluation.

In addition, it was also found that claimant's brother, who is a couple of years older, has Charcot-Marie-Tooth disease.

The following pertinent findings of fact were excepted to by the claimant:

5. Dr. Hurwitz first saw plaintiff on December 10, 1980. He conducted various tests which revealed moderately severe degenerative changes of the nerves which indicated the presence of a problem over a prolonged period of time. Dr.

Hurwitz diagnosed plaintiff's condition as Charcot-Marie-Tooth disease, a hereditary degenerative nerve disease which manifests itself in different ways from family to family and case to case. It sometimes, however, runs a similar course in the same family. Dr. Hurwitz was of the opinion that the fracture of one leg would not be related to weakness in all four extremities.

7. Before his accident in September 1979, plaintiff had some problems with his hands and a drop-foot limp with his right foot, but these problems did not give him enough trouble to affect his work or other activities. Since his accident, he has been totally disabled and his condition is not likely to improve. Plaintiff is permanently and totally disabled as a result of his hereditary Charcot-Marie-Tooth disease.

8. Plaintiff's injury by accident on September 21, 1979 and his subsequent convalescence, during which his leg was in a cast and he was comparatively inactive, did not cause or aggravate his preexisting degenerative nerve disease. He would be disabled as a result of the disease had he not broken his leg.

The statutes controlling the claimant's right to an award for total disability provide that "where the incapacity for work resulting from the injury is total, the employer shall pay . . ." G.S. 97-29. G.S. 97-2(6) defines "injury" to mean "only injury by accident arising out of and in the course of the employment . . ." G.S. 97-2(9) defines the term "disability" to mean "incapacity because of injury to earn the wages which the employee was receiving at the time of the injury in the same or any other employment." The principles of law determining compensability in those cases in which the claimant suffers from a preexisting illness are summarized in *Morrison v. Burlington Industries,* 304 N.C. 1, 18, 282 S.E. 2d 458, 470 (1981) as follows:

In summary: (1) an employer takes the employee as he finds her with all her pre-existing infirmities and weaknesses. (2) When a pre-existing, *nondisabling, non-job-related* condition is aggravated or accelerated by an accidental injury arising out of and in the course of employment . . . then the employer must compensate the employee for the entire resulting disability even though it would not have disabled a normal

person to that extent. (3) On the other hand, when a pre-existing, nondisabling, non-job-related disease or infirmity eventually causes an incapacity for work without any aggravation or acceleration of it by a compensable accident . . . the resulting incapacity so caused is not compensable. (Emphasis original.)

It is well established that, except as to questions of jurisdiction, the findings of fact made by the Commission are conclusive on appeal when supported by competent evidence, even though there is evidence to support a contrary finding of fact. *Morrison v. Burlington Industries, supra.* The appellate court merely determines from the proceedings before the Commission whether sufficient competent evidence exists to support its findings of fact. *Id.; Moses v. Bartholomew*, 238 N.C. 714, 78 S.E. 2d 923 (1953). However, a finding not supported by any sufficient competent evidence or a finding based on incompetent evidence, is not conclusive and such findings must be set aside. 8 Strong's N.C. Index 3d, Master and Servant, § 96.1, p. 698.

[1] The claimant first contends that the deposition of Dr. Barrie Hurwitz, which forms the basis for the Commission's denial of total disability, was never offered in evidence and therefore was not properly before the Commission and that portions of the Hurwitz testimony were inadmissible hearsay and were erroneously admitted into evidence. We do not agree. The record discloses that at the conclusion of the initial hearing, claimant's counsel advised the Deputy Commissioner that he wished to take the testimony of Dr. Nesbit in Charlotte. Defense counsel then indicated that they wished to take the testimony of Dr. Hurwitz at Duke University Medical Center. Deputy Commissioner Scott entered an order on 7 December 1981, giving the parties 60 days in which to depose Dr. Nesbit and Dr. Hurwitz.

Pursuant to Rule XXA of the Rules of the Industrial Commission, when additional medical testimony is necessary to the disposition of a case, the original hearing officer may order the deposition of medical witnesses. The rule does not detail any specific procedure following the taking of such depositions for their formal offer into evidence. In this case, once Dr. Hurwitz's deposition was completed, the original transcript was forwarded to Deputy Commissioner Scott by the court reporter, with a copy

of the transcript sent to each attorney. This procedure would appear to be sufficient to comply with Rule XXA, *supra*, and, as such, the testimony of Dr. Hurwitz is of record in this case.

Each additional deposition begins with stipulations that all questions were deemed objected and excepted to in the same manner as if objections and exceptions were noted and appeared of record, and that the answers of the witnesses to each question were deemed to have been subjected to a motion to strike and that exception to the ruling of each such motion is reserved. Further, that the right to enter such objections and exceptions to each question, and the right to move to strike each answer and to except to an adverse ruling on such a motion at the time of the offering of the depositions into evidence is reserved and that such objections and motions may be passed upon by the judge at the time of the offering of the depositions into evidence. Claimant's counsel contends that he was not given the opportunity to exercise these rights, with the result that erroneous and incompetent testimony by Dr. Hurwitz regarding, *inter alia*, claimant's brother was admitted into evidence. Further, that a written request was made that the Deputy Commissioner make evidentiary rulings, but that "this was never done, or if it was done, plaintiff was not given a copy of any such rulings."

[2]  Rule XXA does not establish a specific procedure by which counsel can obtain rulings on their objections or motions to strike in a situation like this. However, we are of the opinion that general rules of practice should govern such situations. Therefore, it is incumbent upon the party wishing to exercise his reserved right to object or move to strike testimony, to separately request the hearing commissioner to rule on the specific deposition questions and answers that the party finds objectionable, with the grounds upon which the objection is taken clearly stated. The hearing commissioner, in turn, must formally enter his or her ruling into the record before making the award. *See Petty v. Transport, Inc.*, 276 N.C. 417, 173 S.E. 2d 321 (1970).

[3]  In essence, this procedure was followed in this case. Claimant's counsel requested, by letter to Deputy Commissioner Morgan Scott, that she "make determinations on the objections [so that] the appeal can be pinpointed with more clarity, especially as to any material dealing with the brother."

The record on appeal does not contain any formal evidentiary rulings. However, stapled to page 9 of the Hurwitz deposition is a copy of a note which reads as follows:

NOTE—

[Plaintiff's] objections regarding the reports on the brother are sustained except that Dr. H[urwitz] may testify that he had access to them (without giving details), who the doctor was, [and] Dr. H. [urwitz] may base his opinion on them in that they are inherently reliable. (*State v. Wade*)

/s/

MS

Although the informality of this manner of ruling on objections is not approved, the fact remains that claimant's only specific objection to Dr. Hurwitz's testimony was expressly ruled upon.

The claimant devotes large portions of his appellate brief to the creation of doubt as to the accuracy of the information Dr. Hurwitz possessed concerning claimant's brother and the course of his Charcot-Marie-Tooth disease. Furthermore, claimant argues that all the testimony concerning his brother Ralph Ballenger was hearsay and improperly admitted into evidence. These are indeed important points because Dr. Hurwitz based his opinion as to the lack of causal relation between the fracture, consequent immobility of claimant's leg and the rapid degeneration of his overall condition, in part, on a parallel he drew between the course of the brother's disease and the claimant's. However, there is *no* evidence of record concerning the brother to support claimant's argument that *because of these alleged inaccuracies* Dr. Hurwitz's opinion is incompetent. We will treat the issue of the competency of Dr. Hurwitz's "opinions" on causation more fully *infra*.

[4] As to claimant's argument, we note that Dr. Hurwitz testified that he had access to information from the plaintiff's brother's neurologist, Dr. Dennis Hill of Winston-Salem, North Carolina. A physician, as an expert witness, may give his opinion, including a diagnosis, based either on personal knowledge or observation or on information supplied him by others, including the patient, if such information is inherently reliable, even though it is not independently admissible into evidence. *State v. Wade*, 296 N.C. 454, 251 S.E. 2d 407 (1979); *State v. DeGregory*, 285 N.C.

122, 203 S.E. 2d 794 (1974). If his opinion is admissible, the expert may testify to the information he relied on in forming it for the purpose of showing the basis of the opinion. *State v. Wade, supra; Penland v. Coal Co.,* 246 N.C. 26, 97 S.E. 2d 432 (1957). Insofar as Dr. Hurwitz's testimony does consist of statements of his expert opinion, and those opinions are admissible, he was properly permitted to testify about the information he obtained concerning the plaintiff's brother's condition from another physician. Claimant's counsel was free to bring out any factual errors or lacunae in the information Dr. Hurwitz received from Dr. Hill on cross-examination, but may not introduce such information for the first time in his appellate brief.

The gravamen of claimant's appeal, however, is that the testimony by Dr. Hurwitz is incompetent on the issue of whether claimant's preexisting degenerative nerve disease was aggravated or accelerated by the inactivity of the leg and the claimant generally while the leg was healing from the fracture. Claimant contends that the only competent evidence before the Commission was that of Dr. Sanders, the treating physician, and Dr. Nesbit, the neurologist Dr. Sanders referred claimant to. We agree.

The most striking aspect of the Hurwitz deposition testimony is that, taken as a whole, it was wholly and totally contradictory on the issue of whether, in Dr. Hurwitz's opinion, aggravation or acceleration of the disease occurred as a result of the injury. On direct examination, Dr. Hurwitz testified that he examined Ballenger once in December, 1980. At that time he performed a nerve biopsy on Ballenger and testified that the nerves showed "moderately severe" degenerative changes, indicating that the problem had been there for some time, probably for more than a year. Dr. Hurwitz was unable to say exactly how long such changes had been there. Dr. Hurwitz testified on cross-examination that the disease progressed gradually in some people and more rapidly in others, with physical activity playing a role in maintaining existing muscle function.

As to the effect of the fracture on Ballenger's condition, Dr. Hurwitz testified on direct examination as follows:

Q. Do you have any opinion as to what relation, if any, there was between his previous weakness and the fracture?

A. Yeah, it seemed to me that the fracture was an incidental event that occurred. It may well be that the underlying neuropathy rendered him more susceptible to the fracture.

\*     \*     \*

Q. Okay. You also stated that you felt the fracture was an incidental event. Could you explain a little more in detail what you meant by that statement?

A. Yes.

\*     \*     \*

A. . . . Now, when we examined him he had problems with both legs not just the left leg. He had frail feet. In other words, the feet were exceptionally weak and he had great difficulty elevating them upwards against any resistance. You know this involved both feet. This was not just one foot, the left foot being significantly weaker than the right foot.

*He had some problems with his arms as well and I cannot relate weakness in all four extremities just to a single fracture of one leg.*

*It would seem to me that if the fracture had caused severe nerve damage to his left leg, that the left leg should have been significantly different to [sic] the right leg. And we—did not find that.*

Q. So is it your opinion, Doctor, that the nerve damage you found when you examined this man was a natural result of the progressive nature of the disease and was not related to or did not reflect any aggravation as a result of the fracture?

A. *Yes, I would think that the problems that he had were the result of this degenerative nerve disease. I would guess that the fracture was an incidental event in the natural history of the disease.*

He related a lot of his problems to this fracture, but I would think that this was something which brought his attention to the illness. And from the evidence we had from the  studies and so on, *I could not state that the fracture was the direct*

*cause of the diffuse weakness that he showed in both legs and in the arms.*

\* \* \*

Q. So, is it your opinion that he more than likely would have been disabled as a result of his disease—

A. (Interposing) *I would think so.*

Q. —without—without the fracture ever occurring?

A. *I would think so.*

On cross-examination, Dr. Hurwitz was asked if Ballenger's work record indicated any disability due to his disease before his injury. He answered,

No, I think as I mentioned earlier I thought he was an exceptional individual who was very hard working, very well motivated and as I said when I saw him, I was surprised that he was working that well. I'm sure many other people would —would not have.

Dr. Hurwitz was also unable to say when Ballenger might have been disabled in the future by the disease if he had not slipped and broken his leg.

*If he were working well up until the time and he had not fallen, I would guess that he probably would have been able to continue working* . . . So, clearly between 1979 and when I saw him there was a change and that change if he had not fallen and been kept out of work because of the cast, I would guess would have been a gradual decline. *And it would be a guess as to exactly what point in time he would have been unable to work. I— I can't answer that.*

Claimant's counsel essentially repeated the question later, and again Dr. Hurwitz testified that Ballenger *probably* would have been able to continue at his job indefinitely had he not injured his leg. Further, Dr. Hurwitz admitted that he could only *speculate* as to when a significant deterioration would have occurred in the natural course of the disease's progression between 1979 and his December, 1980 examination had the injury not occurred. Dr. Hurwitz then elaborated as follows:

A. . . . And at what point he would have changed from 1979 until then I could not answer.

Q. It would be only a speculation.

A. Exactly. I think the—the *interesting learned speculation or shall I say educated guess would be that it probably would have occurred somewhere in that period.* If you take into account the history of his brother, Mr. Ralph Ballenger, who apparently also about age forty-seven (47) developed significant problems that would only come on within a space of a few years . . . *So my guess would be that he was behaving in a similar fashion to his brother. That's an educated guess.*

[5]  At the outset, we note that the number of times that the word "guess" appears throughout Dr. Hurwitz's testimony is striking. Expert medical witnesses are called to testify on issues of causation in disease or illness for the purpose of giving their *expert opinions* as to the *reasonable scientific certainty* of a causal relation or the lack thereof. An expert witness may base his opinion upon facts within his own knowledge or upon information supplied to him by others; however, an expert is not competent to testify as to the issue of causal relation founded upon mere speculation or possibility. *Dean v. Coach Co.*, 287 N.C. 515, 215 S.E. 2d 89 (1975); *Lockwood v. McCaskill*, 262 N.C. 663, 138 S.E. 2d 541 (1964). On the crucial issue of whether Johnny Ballenger's condition was the result of his disease alone or resulted from the combination of his relative inactivity and immobility during his convalescence and his underlying non-disabling disease, Dr. Hurwitz testified only to his "educated guess" that Ballenger would have deteriorated at about that time regardless of his injury, in parallel fashion to events in the course of his brother's disease. These portions of Dr. Hurwitz's testimony, which, in large part, form the basis of the Commission's factual findings, are incompetent as expert opinion evidence on causation.

[6]  Defendants contend that Dr. Hurwitz also based his opinion that the fracture and confinement of claimant's left leg to a cast did not aggravate or accelerate his Charcot-Marie-Tooth disease on his examination of the claimant and the results of the tests he performed. However, the major problem with Dr. Hurwitz's testimony lies not with the bases of his "opinions," but in the

totally contradictory propositions that they stand for, to wit: that despite the disease, had Ballenger not injured his leg in September, 1979, he probably could have continued working for an indeterminate amount of time and to the contrary, that his total disability as of December, 1980, was solely attributable to the natural progression of the degenerative nerve disease. Dr. Hurwitz simply could not give a competent opinion as to whether a significant deterioration would have occurred between 1979 and 1980 in the natural course of events. As a result of these deficiencies and contradictions, Dr. Hurwitz's opinion on causation simply does not constitute any sufficient competent evidence on which to base a denial of disability benefits to this claimant. Therefore, the findings of fact that claimant's injury and convalescence did not aggravate his preexisting disease and that he would be disabled as a result of the disease had he not broken his leg must be set aside.

Furthermore, we note that the absolute nature of these findings totally ignores the directly conflicting statements in the testimony of the two other expert medical witnesses, Dr. Sanders and Dr. Nesbit. As this Court observed in *Thompson v. Transfer Co.*, 48 N.C. App. 47, 53, 268 S.E. 2d 534, 538, *cert. denied*, 301 N.C. 405, 273 S.E. 2d 450 (1980), "it is one thing for the commissioner to reject evidence as being incredible, but it is another to say that evidence does not exist *at all*." In this case, we find a considerable amount of competent evidence which would tend to show that the progress of claimant's preexisting disease was aggravated or accelerated by his accidental injury:

1. Dr. Sanders testified that orthopedic surgeons frequently deal with complications of Charcot-Marie-Tooth disease either separately or in conjunction with a neurologist; that the disease produces changes in the nerves, resulting in loss of nerve function and as a consequence, deterioration of the muscles because of lack of nerve supply; that basically only symptomatic treatment is available for the disease and that is to maintain physical activity at an even level.

2. In Dr. Sanders' opinion, Ballenger's prolonged period of inactivity while his leg was in a cast and his not being able to carry out his usual day-to-day activities was a factor in the abrupt, rapid progression of his disease.

3. Dr. Nesbit testified that Charcot-Marie-Tooth disease is genetically based, causing steadily progressive deterioration of the peripheral nerves with resultant progressive loss of strength in muscle mass, usually beginning in the lower extremities and progressing to the hands and arms; that the treatment used is mainly supportive, to maintain muscle condition and brace weak joints when necessary; that the maintenance of a normally active life, with the avoidance of periods of relative inactivity may slow the impairing effects of the disease; that Ballenger's previous level of activity would be conducive to retarding the impairing effects of the disease; and that there was evidence of the presence of the disease in Ballenger's hands and legs as early as 1975.

4. Dr. Nesbit testified that it was his opinion that Ballenger's disease had been progressing slowly until 1979, when it accelerated with devastating rapidity; that the likely effect of seven months of inactivity due to a broken leg and the leg being in a cast on a previously active person would be an increase in muscle wasting and weakness in those extremities that are affected by the disease; that Ballenger's preexisting condition was accelerated by his being immobilized in a cast; and that Ballenger most probably would not have reached the degree of disability that he did by late 1980 were it not for the period of inactivity while his fractured leg was in a cast.

In conclusion, we hold that the Commission's factual findings on the lack of a causal relation between claimant's injury by accident and his total disability are not supported by any sufficient competent evidence and therefore must be set aside. There was sufficient competent evidence of record to enable the Industrial Commission to find that claimant's preexisting disease was aggravated or accelerated by a compensable injury, resulting in total and permanent disability. *Morrison v. Burlington Industries, supra.* Therefore, the opinion and award of the Industrial Commission is vacated, and the cause remanded for findings of fact, conclusion of law, and an award consistent with this opinion.

Vacated and remanded.

Judges BECTON and BRASWELL concur.