The undersigned have reviewed the Award based upon the record of the proceedings before the Deputy Commissioner.
The appealing party has shown good grounds to reconsider the evidence. However, upon much detailed reconsideration of the evidence, the undersigned reach the same facts and conclusions as those reached by the Deputy Commissioner, with minor technical modifications. The Full Commission, in their discretion, have determined that there are no good grounds in this case to receive further evidence or to rehear the parties or their representatives, as sufficient convincing evidence exists in the record to support their findings of fact, conclusions of law, and ultimate order.
Accordingly, the Full Commission find as facts and conclude as matters of law the following, which were entered into by the parties at the initial hearing, as
STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The Employer-Employee relationship existed between the Plaintiff and the Defendant-Employer.
3. The carrier liable on the risk is CNA Insurance Company.
4. Plaintiff's average weekly wage is as set forth on the Form 22 (wage chart).
5. The Defendants deny that the Plaintiff sustained an injury by accident arising out of and in the course of the employment on or about July 23, 1993.
6. Various medical records and other documents have been stipulated into evidence with the Pre-Hearing Agreement.
* * * * * * * * * *
Based on the competent, credible, and convincing evidence of record, the undersigned make the following
FINDINGS OF FACT
1. At the time of the initial hearing, Plaintiff was 43 years old, had a tenth grade education, and a varied work history including jobs in furniture factories, assisting in manufacturing of back braces for an orthopedic company, and waitressing.
2. On May 5, 1993 the Plaintiff was placed by Manpower in a position as a fabric cutter at Southwood Furniture. Shortly thereafter, on July 23, 1993, while performing her duties as a cutter, Plaintiff stepped backwards, caught her foot on a rug, and fell backwards, landing on her buttocks. She did not hit her head, shoulder, or neck, and initially did not believe that she was hurt.
3. Following the incident, Plaintiff worked her normal job duties at Southwood for over one month, and she had no difficulty except with heavy lifting. Near the end of August, Southwood no longer required Plaintiff's work on a temporary basis. Therefore, on August 26, 1993, Manpower offered to place the Plaintiff in a handsanding position at Century Furniture which met lifting restrictions imposed by Dr. Brown. Plaintiff refused to attempt this job, stating that she thought it would be a strain on her shoulder, even though none of her physicians had restricted use of the shoulder. On or about September 9, 1993, Manpower offered the Plaintiff yet another position at Clayton Marcus which involved pairing tickets with fabric for chairs, placing the fabric on the chair, and sliding the chair to a nearby co-worker. Again, there were no lifting requirements, and Plaintiff was not restricted from pushing or pulling activities. Nevertheless, Plaintiff performed the job for only one day. Approximately ten days later the Plaintiff had obtained permanent employment at a restaurant. Manpower then placed Plaintiff on an inactive status.
4. Following the July 23, 1993 incident, Plaintiff was initially seen by Dr. Robert Hart on July 26, 1993. Upon examination, the Plaintiff was neurologically intact and had no symptoms or objective signs of nerve entrapment or a herniated cervical disc, according to the doctor. As all tests indicative of a herniated disc were normal, according to him, Dr. Hart diagnosed a cervical neck strain and a strain to the left wrist. Plaintiff was instructed to continue her work with the restrictions of no lifting over ten to fifteen pounds. Plaintiff returned to Dr. Hart on July 30, 1993 and August 6, 1993 and again, examinations on both dates revealed no objective signs of a herniated disc or impinged nerve according to the doctor. Although the Plaintiff had one complaint of a burning sensation on July 30, according to Dr. Hart, such complaint, along with all other subjective complaints, were consistent with cervical strain. Throughout this time period Plaintiff's only work restrictions were of no lifting over fifteen to twenty pounds, and Dr. Hart stated that if jobs were available he would have expected the Plaintiff to work.
5. On August 13, 1993, Plaintiff returned to Dr. Hart with a definite change in symptoms. According to the physician, Plaintiff was complaining of a multitude of symptoms including lower back pain and, for the first time, radiation of pain. Again, however, all neurological tests were normal and there were no objective findings to indicate a herniated disc according to the doctor. Nevertheless, due to the change in symptoms, Dr. Hart referred Plaintiff to Dr. P. E. Brown, an orthopedic surgeon. As of the last time which Dr. Hart saw the Plaintiff on August 19, 1993, she was still able to work in a light duty capacity and according to Dr. Hart, she would have been capable of performing a handsanding job such as that which had been offered by Manpower near that time. In Dr. Hart's expert opinion, the incident of July 23, 1993, did not result in a herniated disc and rather caused a cervical strain.
6. Plaintiff's treatment was thereafter undertaken by Dr. P. E. Brown, an orthopedic surgeon; Dr. Brown treated the Plaintiff for a number of years prior to the 1993 incident. Specifically, as reflected in the stipulated medical records from Hickory Orthopedic Center from 1990 through 1993, Plaintiff had numerous spinal difficulties including a herniated lumbar disc which occurred without any specific inciting injury or event. In February of 1991 a lumbar decompression, discectomy, and fusion surgery were performed at the L4-5 level and the Plaintiff continued to have difficulty and remained out of work for a significant time thereafter. Eventually, in 1992, Plaintiff began complaining of upper back and neck pain and stiffness. Brown suspected a possible fibromyalgia or inflammatory condition in the cervical region. As of January 18, 1993, Plaintiff's primary complaints were of neck pain radiating into the left shoulder and arm without tingling. According Dr. Brown, these symptoms could have been indicative of a cervical disc problem or an inflammatory condition.
7. As to treatment rendered by Dr. Brown following the work incident in question, Plaintiff was initially seen on August 24, 1993 with reports of pain in the mid and upper back area. Upon examination, Plaintiff had no spasms, moved her neck fairly well, had no radicular pain, no complaints of numbness and tingling, and all neurological findings were completely normal. Cervical and thoracic x-rays revealed mild spondylosis, a degenerative condition, but no other abnormalities according to the doctor. As such, Dr. Brown concluded that there were no signs of a herniated cervical disc and that no further diagnostic testing was necessary. Thus, as of one month after the incident, an orthopedic specialist concluded that the Plaintiff did not have a herniated cervical disc and had suffered only a contusion or strain to the thoracic spine. It is notable that this was the same conclusion previously reached by Dr. Hart. Dr. Brown likewise agreed that Plaintiff could work with lifting restrictions of no greater than ten to twenty pounds.
8. Plaintiff returned to Dr. Brown on September 17, 1993 and October 15, 1993, and again examinations on both dates revealed no objective finding indicative of a cervical disc herniation according to the doctor. Conservative treatment was continued by Dr. Brown, and he anticipated no permanent partial impairment as a result of the July 23, 1993 work incident. As to work, Dr. Brown saw no problem with the Plaintiff performing the waitress job at Western Steer.
9. Plaintiff then did not return to Dr. Brown or to any other physician until December 10, 1993. At this time her symptoms changed, and she reported pain in her back and legs. The physician commented "I'm certainly not sure what is going on with this young lady," and diagnosed a possible inflammatory process just as he had suspected prior to the July 1993 work incident. Upon return on February 7, 1994 the Plaintiff reported only back pain and had no radicular or neurological symptoms or signs indicative of a herniated disc. The day after this visit, February 8, 1994, the Plaintiff fell in a hole injuring her ankle. At the next visit for her spine complaints, April 13, 1994, again Plaintiff's symptoms changed and for the first time during any of her post-accident visits to Dr. Brown she reported numbness in her arm. It was only at this point — nine months after the incident — that Dr. Brown found signs of a cervical radiculitis. The Plaintiff was thus referred for a neurosurgical evaluation.
10. On deposition, Dr. Brown was unmistakably clear as to his diagnosis and opinions throughout treatment. Prior to April 1994, the symptoms and findings reported by the Plaintiff were suggestive of only a strain or an inflammatory process and not of a herniated disc, in his opinion. It was over nine months after the incident, in April 1994, that the Plaintiff had any objective findings of a herniated disc. Dr. Brown further noted that he would expect an individual with a disc herniation to have symptoms and objective signs of disc herniation with little or no trauma and that he has treated many individuals who cannot pinpoint a specific event as the cause of the herniation. Finally, Dr. Brown concluded that he could not render an opinion with any degree of medical certainty that an incident of July 1993 caused the cervical disc herniation discovered over nine months later.
11. Plaintiff was then treated by Dr. Sam Chewning and Dr. Mark Hartman of Miller Orthopedic Clinic. Treatment was initially rendered on May 3, 1994, at which time the Plaintiff had distinct complaints of numbness and radicular pain. A CT scan revealed some deformity at the C-7 nerve root, and eventually, on October 1, 1994 a cervical fusion and discectomy were performed. According to Dr. Hartman, prior to the October 11, 1994 surgery, the Plaintiff was able to perform light duty work. Following surgery, the Plaintiff recovered well until January 18, 1995 when she suffered a pulled muscle in her right shoulder unrelated to the cervical condition. This new injury slowed the Plaintiff's recovery by approximately one month, and therefore she was not released to return to light duty work until March 1, 1995. Follow up treatment was eventually undertaken by Dr. Brown, who saw the Plaintiff on May 10, 1995, and June 26, 1995. No work restrictions were imposed by Dr. Brown.
12. In June 1994, Plaintiff voluntarily admitted herself for psychiatric treatment at Frye Regional Medical Center, where she was treated by Dr. Sarah Peters for depression. During her eleven day stay, in addition to discussing her herniated disc and workers' compensation litigation, Plaintiff discussed a multitude of emotional stressors including sexual abuse as a child, leaving home as a young teenager, the death of a husband, a divorce, difficulty with her children, and a current relationship with an alcoholic. Of further importance, Plaintiff had been treated prior to July 1993 for bouts of depression. After her release from the hospital on June 24, 1994, she received no further treatment. As the herniated disc was not related to the July 23, 1993, incident, any resulting depression caused in part by this disc condition necessarily is also not related back to the July 23, 1993, incident.
13. Except for a period of time following the October 11, 1994 surgery, Plaintiff's physicians have generally advised her to work with certain lifting restrictions of no greater than ten to twenty pounds and, for a brief period of time, part-time work only. Nevertheless, the Plaintiff has made little, if any attempts, to engage in employment. While she performed the duties of a waitress at Western Steer beginning in September 1993, she voluntarily left employment with the restaurant in late December 1993. She sought no employment whatsoever thereafter and never contacted Manpower about a temporary position. After her release to return to work on March 1, 1995 after cervical fusion, Plaintiff finally reported to Manpower on March 20, 1995 — over one and a half years after she had been placed on inactive status. Although Ms. Miller of Manpower testified at the hearing that no temporary positions were available within Plaintiff's lifting restrictions at that time, she noted that Manpower was willing to accommodate Plaintiff if a temporary position became available. Plaintiff apparently has made no other attempts to find employment.
* * * * * * *
Based on the foregoing stipulations and findings of fact, the undersigned makes the following
CONCLUSIONS OF LAW
1. One of the most fundamental concepts of the Workers' Compensation Act is that in order to be entitled to benefits, a Plaintiff must establish by a preponderance of the evidence a clear causal connection between an identified accident and the condition allegedly causing disability. Click v. Pilot FreightCarriers, 300 N.C. 164,167-68, 265 S.E.2d 389, 392 (1980). The significant burden carried by the Plaintiff can only be met by the presentation of competent, credible, and convincing evidence which rises above the level of speculation and as such, a claimant cannot prevail if the evidence is merely evenly balanced. Arthur Larson, The Law of Workmen's Compensation, Section 80.33(a) (1989).
2. In order to sustain the substantial burden of proving causation, the Plaintiff must present competent, credible, and convincing evidence based upon some reasonable medical certainty. In addressing the issue of causation, an expert is not competent to testify if his opinions are founded upon mere speculation or possibility. Ballenger v. Burris Indus., 66 N.C. App. 556, 567,311 S.E.2d 881, 888, rev. denied, 310 N.C. 743, 315 S.E.2d 700
(1984). In the instant case, the Plaintiff has failed to present credible or convincing evidence sufficient to sustain her burden of proof regarding causation of her herniated cervical disc. Instead, the medical evidence and expert opinions before the Commission, particularly those in the crucial weeks and months following the alleged fall, all reveal that the Plaintiff's herniated disc is in no way related to her employment. Therefore, Plaintiff does not prevail.
* * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the undersigned enter the following
ORDER
1. Plaintiff's claim for workers' compensation benefits is hereby DENIED.
2. Each side shall pay its own costs.
It is further ORDERED that this case be REMOVED from the Full Commission hearing docket.
This the _________ day of _______________, 1997.
 S/ ____________ J. HOWARD BUNN, JR. CHAIRMAN
CONCURRING:
S/ ____________ COY M. VANCE COMMISSIONER
S/ ____________ MORGAN S. CHAPMAN DEPUTY COMMISSIONER
JHB/kws