The appealing party has shown good grounds to reconsider the evidence. However, upon much detailed reconsideration of the evidence, the undersigned reach the same facts and conclusions as those reached by the Deputy Commissioner, with some modification. The Full Commission, in their discretion, have determined that there are no good grounds in this case to receive further evidence or to rehear the parties or their representatives, as sufficient convincing evidence exists in the record to support their findings of fact, conclusions of law, and ultimate order.
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employment relationship existed between the parties at all relevant times.
3. At the relevant time, plaintiff's average weekly wage was $280.80 yielding a compensation rate of $187.18.
4. The parties stipulated to document marked "Stipulated Exhibit #1" which is a document concerning short-term benefits paid to plaintiffs.
***********
Based upon all of the competent evidence from the record herein, the Full Commission adopts the findings of fact by the Deputy Commissioner with minor modifications as follows:
 FINDINGS OF FACT
1. Plaintiff was thirty-four years old at the time of the hearing before the Deputy Commissioner with a ninth grade education.
2. Plaintiff began working for defendant on or about August 20, 1986. Plaintiff's first job was an inspector of sleeves. In 1993, plaintiff became an automatic sleeve sewer where she contends she developed her problems.
3. As an automatic sleeve sewer, plaintiff would pick up a bundle of sleeves which were brought to her workstation in carts or the conveyor. The bundles weighed approximately 20 pounds. Plaintiff placed them on a shelf approximately shoulder height directly in front of her. From there she would reach and pick up sleeves individually, which weighed a matter of ounces, laid them on the table in front of her, folding them over to line up the seams of the sleeves and then pushing the sleeves to the automatic sewing machine to be automatically sewn. Plaintiff did not have to sew the sleeves herself. After the automatic sewer sewed the sleeves, they were automatically stacked. Once plaintiff finished her bundle, she would tie the bundle and place it in a cart or on a conveyor. The activities of getting the bundles, lining up the sleeves and feeding them into the automatic sewer accounted for approximately 75% to 90% of plaintiff's job. Plaintiff's job was a production job, and she made approximately 2,837 sleeves per day during an 8-hour day. Defendant submitted a videotape of the job, which was admitted as defendant's Exhibit No. 1 and more particularly shows the duties of the automatic sleeve sewer.
4. Plaintiff states that her problems in her arms began in January of 1997. On January 28, 1997, plaintiff was evaluated by Gary Kuzma, M.D. of the Hand Center of Greensboro. Dr. Kuzma is an orthopaedic surgeon and specialist in hand surgery and treatment. Dr. Kuzma had previously treated plaintiff from 1994 through 1996 for a ganglion cyst on plaintiff's left wrist. Dr. Kuzma took a history from plaintiff complaining of swelling in the palmar aspect to both wrists. On February 28, 1997, Dr. Kuzma noted nerve conductions revealed a C6-7 radiculopathy, but no evidence of carpal tunnel syndrome. Dr. Kuzma referred plaintiff for a neurosurgical evaluation.
5. Plaintiff was subsequently evaluated by Joseph Stern, M.D. of Guilford Neurosurgical on March 17, 1997. On April 10, 1997, Dr. Stern noted plaintiff had returned following a cervical MRI, which did not show any significant abnormalities. He noted plaintiff continued to complain of severe bilateral hand and arm pain and persistent weakness. Dr. Stern recommended plaintiff return to Dr. Kuzma for further treatment of her hand complaints.
6. Plaintiff was evaluated by James D. Lawson, M.D., a thoracic surgeon, on April 30, 1997. Dr. Lawson noted plaintiff's complaints of bilateral arm and wrist pain and numbness. Dr. Lawson did not think plaintiff's symptoms were severe enough to consider cervical rib resections and swelling of plaintiff's hands was atypical. Dr. Lawson thought plaintiff could have an ulnar nerve entrapment bilaterally, accounting for her numbness in the fingers.
7. Plaintiff was evaluated by Allan H. Friedman, M.D. of Duke University Medical Center on July 15, 1997. Dr. Friedman's examination showed that plaintiff did not have any numbness in her hands when putting her hands up over her head, nor did she get any weakness under those circumstances and had no wasting of the hands. He also saw no weakness or numbness that he could detect. Dr. Friedman noted that he did not believe that plaintiff manifested symptoms of thoracic outlet syndrome.
8. Plaintiff was also seen by Mitchell J. Bloom, M.D. of Moses Cone Rehabilitation Center. Dr. Bloom evaluated plaintiff and also performed a functional capacity evaluation. As of October 27, 1997, Dr. Bloom noted that plaintiff's functional strength deficit was 0%, and since a good percentage of her FCE showed submaximal effort, he did not believe further treatment was warranted. He felt plaintiff could return to her previous occupation at that time.
9. On November 3, 1997, Dr. Kuzma noted that plaintiff had returned, but her hands were basically unchanged. He noted that Dr. Bloom had performed an FCE and had evaluated her. He noted that plaintiff had applied for disability and that he would recommend her for vocational rehabilitation. Dr. Kuzma noted that he saw nothing that would necessitate any surgical intervention and would see plaintiff again as needed.
10. Plaintiff testified that since leaving work with employer on or about March 24, 1997, she continues to have pain and numbness in her upper extremities, hands and fingers. Dr. Kuzma noted that plaintiff could have continued doing her regular work after February 18, 1997. Dr. Kuzma also noted that it is significant that plaintiff testified that she continued to have pain up and down her arms, even after leaving employment, and that it is very difficult to try to determine the cause of someone's problems with nonlocalized pain.
11. Plaintiff has tenosynovitis. Plaintiff has not proved by the greater weight of the evidence that her tenosynovitis was caused by trauma in the employment.
***********
Based on the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSION OF LAW
Plaintiff has failed to present sufficient evidence to find that she suffers an occupational disease compensable under the North Carolina Workers' Compensation Act. In order for tenosynovitis to be a compensable occupational disease, plaintiff must show that her tenosynovitis was caused by trauma in her employment. N.C. Gen. Stat. § 97-53(21). This causation issue is a question for medical testimony and the most credible medical testimony from Dr. Kuzma was that specialists do not know the cause of tenosynovitis and, at most, that plaintiff's tenosynovitis was possibly related to her employment. That evidence does not meet plaintiff's burden. Ballenger v.Burris Industries, 66 N.C. App. 556, 311 S.E.2d 881 (1984).
***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Plaintiff's claim under the law must be and is HEREBY DENIED.
2. Each side shall pay its own costs.
This the ___ day of December 1999.
S/_____________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
S/_____________ BERNADINE S. BALLANCE COMMISSIONER
S/_____________ THOMAS J. BOLCH COMMISSIONER
LKM/jth