***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the award, except for minor modifications, the Full Commission AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner with some modification.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties entered into a Pre-Trial Agreement on or about February 6, 2001, which was marked Stipulated Exhibit 1. This Pre-Trial Agreement includes certain stipulated Industrial Commission forms and stipulated medical records.
2. At the time of plaintiff's alleged injury, the parties were bound by and subject to the provisions of the North Carolina Workers' Compensation Act. The employer was a duly qualified self-insured under the provisions of the Act, and Key Risk Management Services, Inc. was the servicing agent.
3. An employee-employer relationship existed between plaintiff and defendant at all relevant times.
4. The date of plaintiff's alleged injury by accident is July 7, 1999.
5. Subsequent to the hearing before the Deputy Commissioner, the parties stipulated that plaintiff's average weekly wage at the time of her alleged injury was $666.70.
6. Subsequent to the hearing before the Deputy Commissioner, the parties stipulated that the employer paid disability benefits through a company-funded accident and sickness plan in the amount of $4,714.29 for which the employer may be entitled to a credit against any compensation due plaintiff.
 ***********
The Full Commission adopts the findings of fact found by the Deputy Commissioner with some modifications and finds as follows:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a 30 year old female, born May 23, 1970. She completed high school and obtained certification as a cosmetologist. Plaintiff attended stewardess school and at the time of the hearing before the Deputy Commissioner was enrolled in a local community college pursuing an associate's degree in information systems. Prior to her employment with defendant-employer, plaintiff worked five years as a creeler with a local textile manufacturer.
2. Plaintiff became employed with defendant-employer on March 28, 1994, in the Azdell department. On July 27, 1996, she became a sliver handler. Defendant-employer manufactures fiberglass. Plaintiff's work as a sliver handler required her to use a small metal instrument called a bead pick to direct stands (threads) of fiberglass as they extruded from an overhead furnace through bushings, which applied a binder material. The strands of fiberglass continued to the floor beneath the sliver platform where they were wound onto spools called packages. The fiberglass threads extruded at a level slightly above plaintiff's head. Plaintiff is 5 feet 3 inches tall. As strands of glass extruded from the furnace through bushings, a mist of water was immediately applied to cool the material. The strands of glass were not hot. Plaintiff also used the bead pick to remove "beads" or lumps that formed in the strands and caused the strands to break or otherwise produce inferior product. The beads of fiberglass were hot.
3. Occasionally, sliver handlers must work with "breakouts" or "pile outs", when the strands either break or develop beads and begin moving in slow motion. When this occurs, the strands begin accumulating around the binder applicators instead of flowing smoothly to the floor below to be wound. The sliver handler must clear out the accumulated glass and start the strands flowing again. A breakout does not produce a pile of glass or a mound of material.
4. Plaintiff testified that sometime during the week of July 7, 1999, but after July 4, 1999, she was helping rake down glass from a breakout when a piece of hot fiberglass approximately ½ inch long and about the diameter of the tip of her little finger, fell down her shirt, landed in her bra, and burned a hole through her left breast, exposing an implant previously placed by a plastic surgeon.
5. At the time of her alleged injury, plaintiff was wearing a T-shirt, which had a crew neck and fit against her breastbone, and a sports bra. Plaintiff alleged the piece of hot glass burned a hole in her bra and shirt. Plaintiff denied having any burns or other wounds to her neck, breastbone, chest or elsewhere from the piece of hot glass other than three small wounds on the inner quadrant of her left breast. According to plaintiff, the glass extruding from the furnace was approximately 2200-2300 degrees.
6. At the time of her alleged injury, plaintiff was working with Dennis Ledbetter. Mr. Ledbetter observed plaintiff brushing her shirt and holding it out. He watched her leave the work area in a hurry.
7. Plaintiff initially went to the restroom alone. On her way out and up the stairs to return to work, she encountered a supervisor, Linda Morrow. She asked Ms. Morrow to accompany her to the restroom, and Ms. Morrow agreed. Ms. Morrow confirmed that plaintiff was wearing a T-shirt. Upon entering the bathroom, she pulled her shirt up over her breasts and "flipped" up her bra, turning it inside out. Ms. Morrow did not observe anything fall from plaintiff's bra. Plaintiff directed Ms. Morrow's attention to a spot underneath her left inner breast and toward the center, which Ms. Morrow observed to be brownish in color and about the size of a fingernail. Plaintiff had to lift her left breast to expose the area. Ms. Morrow gave plaintiff an antibiotic cream, and advised her to apply it to the area. She told plaintiff to follow-up with the plant nurse.
8. Plaintiff presented to defendant-employer's occupational and health manager, Sherry Murphy, R.N., on July 15, 1999. Plaintiff showed Ms. Murphy an area underneath her left breast where she alleged she had been burned by a ½ inch bead of glass which had landed in her bra. Ms. Murphy examined plaintiff's neck and chest area and did not observe any marking suggesting a burn. Plaintiff lifted her left breast to reveal two small wounds in the skin fold underneath the breast. The wounds appeared to be part of a surgical scar and could not be seen without plaintiff lifting her breast.
9. Plaintiff consulted Dr. Daniel Ness, plastic surgeon, on February 18, 1998, regarding possible breast augmentation. Dr. Ness discussed with plaintiff the possible complications of augmentation, including skin tightness, which can lead to breakdown or separation of skin tissue. On March 18, 1998, plaintiff underwent bilateral breast augmentation with 450 cc implants. The incisions for this procedure were made along the inframammary fold, where the undersurface of the breast meets the chest wall, in the middle of the breast. Plaintiff returned to Dr Ness on March 23, 1999, complaining of irregularities with both breasts with the right worse than left. On April 30, 1999, Dr. Ness performed bilateral capasulectomies to remove scar tissue from plaintiff's breasts. Another 50 cc of material was added to each implant, at plaintiff's request. Plaintiff returned on May 11 and May 17, 1999. Plaintiff was experiencing drainage. When plaintiff returned on May 21, 1999, she was complaining of continued drainage from her left breast, thought to be a sinus tract to the surface. On May 24, 1999, Dr. Ness discussed removal of the left implant, which plaintiff refused. Instead, Dr. Ness inserted a drain on May 26, 1999. At that point, a wound had already developed along plaintiff's incision line underneath her breast. By May 28, 1999, plaintiff was draining at least 100 cc per day. She returned on June 1, 1999, but did not bring her drainage record as instructed by Dr. Ness. Relying on plaintiff's representation that her drainage had abated somewhat, Dr. Ness removed the drain on June 3, 1999. Plaintiff was scheduled to return on June 14, 1999 but did not appear for her appointment.
10. Plaintiff did not return to Dr. Ness until July 13, 1999, at which time she reported continued drainage from her left breast. On that occasion, she had three wounds on the lower inner part of the left breast, underneath the breast and visible only by plaintiff leaning back or lifting her breast. Dr. Ness did not note the wound on the incision line. Through one of the wounds plaintiff's implant was visible. Plaintiff was continuing to have drainage but could not remember when it started. On July 13, 1999, Dr. Ness recommended that plaintiff have her left implant removed on July 14 or 15, 1999. Once an implant is exposed, it must be removed because of infection. Plaintiff refused. Dr. Ness wrote plaintiff on July 26, 1999 and informed her that she would be discharged as a patient if she did not reschedule surgery to remove the implant by August 5, 1999.
11. Plaintiff saw Dr. Ness' associate, Dr. Sillins, on August 9, 1999. Dr. Sillins noted that plaintiff had a 1.5 by 1.0 cm opening along her left breast "incisional line" with exposure of her implant. She did not note any other wounds or openings about plaintiff's left breast. Dr. Sillins surgically removed plaintiff's left implant on August 16, 1999.
12. Dr. Ness acknowledged that the wounds he saw on July 13, 1999, could have resulted from continued deterioration and drainage of plaintiff's left breast or from a burn. He could not say to any degree of medical probability that the condition he observed on July 13, 1999 resulted from a burn as opposed to progression of the ongoing problems with plaintiff's left breast.
13. Plaintiff saw Dr. Charles Lampley, an OB-GYN specialist, on July 19, 1999. Dr. Lampley performed an extensive physical examination, which included visual inspection of plaintiff's neck, breast, chest and skin. He did not observe any marks, reddened areas, or scabbing over on her neck or chest to suggest a burn. Examination of plaintiff' left breast revealed an area of skin separation approximately 7-8 mm in length. Dr. Lampley noted that by history, plaintiff had experienced "thinning" of the skin around her implant. Dr. Lampley was of the opinion that by increasing the size of her implants, plaintiff increased the risk of thinning her skin. Plaintiff reported to Dr. Lampley that she had "continual problems" with the skin around her implant healing all the way. Dr. Lampley acknowledged there was nothing about the area of skin separation he saw to suggest plaintiff had been burned. He could not say to a reasonable degree of medical probability that the area he saw was caused by a burn as opposed to ongoing problems plaintiff had experienced with her left breast following surgery.
14. Plaintiff subsequently came under the care of Dr. Harry Caulfield, a plastic surgeon, who first saw her on August 10, 2000, more than one year after her alleged injury. Dr. Caulfield examined plaintiff and found a 7 cm scar, with loss of skin, breast parenchyma, and a portion of the pectoralis muscle on the medial inferior portion of the left breast. Dr. Caulfield opined that the deformity he saw resulted from a wound or infection that had been "surgically debrided." The deformity did not result from a simple burn. Plaintiff was missing skin, fat, breast tissue and muscle. According to Dr. Caulfield, the only way a burn could cause such damage would be "to put something hot on there and leave it on for a long, long, time" or have a complication from a burn, such as an infection, which required surgical removal of skin, subcutaneous tissues, muscle and bone. Upon review of plaintiff's medical records, Dr. Caulfield noted there was no evidence plaintiff ever had a surgical procedure in that area. Dr. Caulfield testified that the defect he saw could have been due to "a hundred other reasons" than a burn. He could not say to any degree of medical probability what caused the area he observed. On October 13, 2000, plaintiff underwent a staged left breast reconstruction with tissue expander, and on March 23, 2001, plaintiff underwent removal of the tissue expander and placement of a permanent implant. Plaintiff will need one or, most likely, two more surgeries.
15. The Full Commission acknowledges that a piece of hot glass fell down plaintiff's shirt while at work and in the course of her employment. This is supported by the testimony of co-worker, Dennis Ledbetter, and supervisor, Linda Morrow.
16. The greater weight of the medical evidence establishes that the burn which plaintiff sustained at work is not the cause of plaintiff's separation and problems with her breast implants. On July 13, 1999, Dr. Ness observed a wound on plaintiff's left breast consistent with her continued problems with tissue deterioration, thinning, and sinus tract drainage of her breast. All her physicians testified that the customary method for inserting a breast implant is through an incision in the inframmmary fold underneath the breast.
16. The physicians who examined and treated plaintiff after July 7, 1999, refused to and indeed were unable to state to any degree of medical probability that the condition of her left breast resulted from a burn.
 ***********
The foregoing stipulations and findings of fact engender the following additional
 CONCLUSION OF LAW
The evidence, inclusive of the medical evidence, fails to establish that plaintiff's failed left breast augmentation proximately resulted from any incident of her employment. Causation must be established by the "greater weight of the evidence" or "preponderance" of the evidence.Phillips v. U.S. Air, Inc., 120 N.C. App. 538, 463 S.E.2d 259 (1995,aff. 343 N.C. 302, 469 S.E.2d 552 (1996). The evidence on causation "must indicate a reasonable scientific probability that the stated cause produced the stated result." Id. 120 N.C. App. at 542,463 S.E.2d at 262, citing Hinson v. National Starch Chemical Corp.,99 N.C. App. 198, 202, 392 S.E.2d 657, 659 (1990). Evidence of causation is insufficient if it "raises a mere conjecture, surmise, and speculation."Id.; see, also, Ballenger v. Burris Industries, 66 N.C. App. 556,311 S.E.2d 881 disc. rev. denied, 310 N.C. 743,315 S.E.2d 700 (1984).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Plaintiff's claim must be, and the same hereby is, DENIED.
2. Defendant shall pay the costs, including the following expert witness fees which are hereby approved: an additional fee of $325.00 to Dr. Ness for the second part of his deposition, a fee of $325.00 for Dr. Caulfield and a fee of $285.00 for Dr. Lampley.
This the ___ day of April 2002.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/______________ RENE C. RIGGSBEE COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
LKM/mhb