***********
Having reviewed the record and the parties' briefs, and after hearing arguments of counsel, the Full Commission affirms the decision of the Deputy Commissioner, with some modification.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employment relationship existed between the employee and the employer.
3. The National Union Fire Insurance Company is the carrier on the risk.
4. The employee's medical records were stipulated into evidence as Stipulated Exhibit 1.
5. The issues before the Commission are whether the employee contracted an occupational disease arising out of and in the course of his employment with defendant-employer, and if so, what compensation, if any, is the employee's beneficiary entitled to receive.
 *********** EVIDENTIARY RULINGS Dr. Seigler — Plaintiff's Salaam/Crist Objection
Plaintiff, pursuant to the Salaam decision, asks that the entire direct examination of Dr. Seigler be stricken from the record because Dr. Seigler was contacted by defense counsel before his deposition in this case.[1] Defense counsel announced at the start of Dr. Seigler's deposition that an attorney from his office had contacted Dr. Seigler on January 21, 2001, or about three days before the doctor's deposition. The deposition reflects that Dr. Seigler examined and treated the employee in 1975. The employee died on August 4, 1999; therefore, there was no ongoing physician-patient relationship at the time of the ex parte communication. Defense counsel stated, and Dr. Seigler so testified, that the doctor was advised in the ex parte
discussion that he was not to discuss any treatment concerning the employee. Dr. Seigler testified that: he was contacted by Neil Andrews, he was not informed as to any chemicals to which the employee may have been exposed, Mr. Andrews asked him whether he had any opinion concerning the potential role of chemicals in causing melanoma, and he informed Mr. Andrews that he had no opinion because the question was outside the area of his expertise. A review of the entire deposition reveals little testimony concerning the treatment of the employee or any questions specifically directed to the employee. In the deposition, Dr. Seigler testified generally about the disease melanoma. His testimony is consistent with other evidence in the record and offers little or no relevant evidence that is not otherwise contained in the record.
Plaintiff asks that the direct examination of Dr. Seigler be stricken pursuant to the application of the Crist rule against ex parte
communication with treating physicians, which was expressly extended to workers' compensation claims in Salaam v. N.C. Dept. of Transportation,122 N.C. App. 83, 468 S.E.2d 53, disc. review improvidently allowed,345 N.C. 494, 480 S.E.2d 51 (1997). In Crist v. Moffatt, 326 N.C. 326,389 S.E.2d 41 (1990), the North Carolina Supreme Court adopted a prohibition against ex parte contact with treating physicians based on the expected relationship between the physician and the patient. TheCrist court noted that the Hippocratic oath taken by the physician created an expectation that the physician would not divulge information the patient may consider to be secret. The Supreme Court further explained that breaches of patient confidentiality could also expose the physician to charges of professional misconduct or tort liability. The considerations of patient privacy, the confidential relationship between doctor and patient, and the adequacy of formal discovery devices prohibitex parte contact with a treating physician. Crist, supra.
Defendants contend that Salaam is not applicable because the ex parte
contact did not seek information concerning the employee and was limited to information concerning Dr. Seigler's expertise on the subject of melanoma. Under the specific facts of this case, the Full Commission agrees with defendants that the contact with Dr. Seigler did not violate the purpose for the common law prohibition against ex parte contact with the treating physician. When the reason for the rule does not exist, then it is not appropriate to apply the rule. In this case, there is no evidence indicating that the discussion with Dr. Seigler involved matters of patient privacy or other factors that could affect the physician-patient relationship.
The pertinent question presented is whether defendants are precluded from contacting a doctor to discuss issues relevant to the doctor's potential testimony as an expert witness when the doctor was a treating doctor and the discussion did not involve, directly or indirectly, information derived from the physician-patient relationship. If theCrist-Salaam prohibition were to apply to any and all ex parte contact with a treating physician, the Commission and courts could become involved in the precarious issue of striking testimony when an attorney and physician had general discussions about medical issues at cocktail parties, over the neighborhood fence, or under other circumstances, including when the contact was innocent and the attorney was not aware that the doctor had provided care to the employee in a particular case.
The intent of the ex parte rule is not to prohibit any and all contact by the attorney with the physician. Judicial economy and the effective administration of justice requires that parties have access to qualified expert witnesses — if for no other reason than to contact a potential expert to determine his qualifications and opinions in order to evaluate whether he is an appropriate witness whose testimony should be presented. Therefore, contact which is shown not to have violated patient privacy and the relationship between patient and physician should not be precluded under the prohibition against ex parte contact. The Full Commission denies plaintiff's Salaam objection because the evidence is that the discussions between Mr. Andrews and Dr. Seigler did not include a discussion of the employee or otherwise invaded or inhibited the physician-patient relationship.
Although the Full Commission denies plaintiff's specific objection, it notes that Dr. Seigler's testimony appears to have been offered by defendants to suggest that, as an expert on the subject of the medical care of melanoma, Dr. Seigler is not concerned with potential chemical exposure — thus raising the inference, defendants contend, that Dr. Seigler's testimony supports the proposition that there is no association between chemical exposure and melanoma. There is no dispute that the employee died from melanoma, and Dr. Seigler's medical records were already in evidence; therefore, Dr. Seigler's general testimony concerning melanoma does not speak to the issue in dispute. Dr. Seigler testified that he had no opinion concerning the potential role of chemicals in causing melanoma and that the subject was outside the "realm of [his] expertise." Dr. Seigler's testimony neither supports nor negates the relevant issue of whether the employee's exposure to the work environment at defendant-employer's plant caused or significantly contributed to the employee's melanoma, and his testimony is not relevant to the issue at hand. G.S. 8C-1, Rule 402.
 Dr. Dalton and Dr. Goodman — Plaintiff's objection: testimony does not assist trier of fact; Dr. Brautbar — Defendant's objection: opinion is not supported by medical science
Plaintiff challenges the competency of testimony from expert witnesses, particularly Dr. Dalton and Dr. Goodman, offered by the defendants. Similarly, defendant has challenged the conclusion testimony of Dr. Brautbar under the theory that his testimony is not scientifically sound. Although plaintiff bases her challenge on Rule 702 of the North Carolina Rules of Evidence,[2] plaintiff's challenge, like that of defendant, appears to be predicated on the United States Supreme Court's opinion in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579,113 S.Ct. 2786 (1993), and its progeny, which generally hold that courts must act as gatekeepers of the evidence and exclude, or otherwise not consider, evidence which is not scientifically sound. Similarly, North Carolina jurisprudence has long held the proposition that "an expert is not competent to testify as to a causal relation which rests upon mere speculation or possibility." Young v. Hickory Business Furniture,353 N.C. 227, 538 S.E.2d 912 (2000), citing Dean v. Carolina Coach Co.,287 N.C. 515, 522, 215 S.E.2d 89, 94 (1975); Cummings v. BurroughsWellcome Co., 130 N.C. App. 88. 91, 502 S.E.2d 26, 29, disc. rev.denied, 349 N.C. 355, 517 S.E.2d 890 (1998); Ballenger v. Burris Indus.,66 N.C. App. 556, 567, 311 S.E.2d 881, 887, disc. rev. denied,310 N.C. 743, 315 S.E.2d 700 (1984).
Consistent with the foregoing case law, when examining the evidence in a workers' compensation claim, the Commission's decision is not limited to bald statements made by physicians and other expert witnesses. Rather, the Commission is entitled, if not required, to determine whether the witness's opinion has a sound, scientifically accepted basis, or whether it constitutes unfounded supposition, speculation, or mere possibility. The Commission should first determine whether the expert testimony is reliable and relevant (i.e., whether the evidence is competent) before weighing the evidence in determining the issues presented in the claim; only legally competent evidence should be placed on the scales of justice to determine where the greater weight of the evidence lies.
Having a Medical Doctor degree does not qualify one to give an opinion on every conceivable medical question. The inquiry must go to the actual qualification of the expert as well as to the methodology used by the expert in reaching his opinion. Thus, a clinical diagnosis unsupported by reliable and accepted methodology will not survive a Daubert
challenge. See C. Burgin, Rule 702, Daubert and Medically RelatedExperts, TRIAL EVIDENCE at III-5 (North Carolina Bar Association 2000). Upon receipt of a Daubert challenge, the Commission should evaluate whether the opinion of the expert has a sufficient factual basis to lift the opinion beyond conjecture, speculation, or possibility. The evidence necessary to support an expert's opinion may vary from case to case, depending upon the state of medical and scientific knowledge.
Not all medical questions can be answered with reasonable probability. In some cases, a differential diagnosis, where the cause of a problem is determined by a process of scientific comparison and elimination, may be accepted as evidence when it is based on widely accepted, standard scientific method for determining the diagnosis and/or the etiology of the condition. See Westberry v. Gislaved Gummi AB, 178 F.3d 257 (4th Cir. 1999). Thus, under some circumstances, evidence of the temporal relationship of the incident to the symptoms may be relevant to determine the diagnosis or etiology, although the maxim "post hoc, ergo propter hoc" (after that, therefore because of that) generally is not acceptable evidence of causation. Compare Westberry v. Gislaved Gummi AB, supra,178 F.3d at 262-65 (the mere fact that two events correspond in time does not necessarily mean that the two are related in any causative fashion, but a temporal relationship between exposure to a substance and the onset of disease or a worsening of symptoms can provide evidence of causation), with Young v. Hickory Business Furniture, 353 N.C. 227,538 S.E.2d 912 ("post hoc, ergo propter hoc" is not competent evidence of causation).
In cases such as this case, where there is conflicting medical opinion as to the etiology of the employee's disease, a party may present expert testimony concerning the accepted scientific method for determining the diagnosis for the injury and/or its cause (etiology) and, in some instances, to provide testimony that another witness's opinion is not scientifically sound and should not be accepted as evidence. This evidence may be presented by a witness who has not personally examined the employee and may not have personal knowledge of the employee's physical and/or mental condition, beyond what is reflected in the medical records.
The testimony of a Daubert witness[3] concerning the reasonable scientific method to diagnose an injury or its etiology and/or the lack of scientific foundation for the opinion of another offered witness will not be excluded on the basis that this witness has not personally examined the witness. A witness, however, who has not examined the patient cannot offer testimony about the employee's injury, disease or condition which is beyond the records made available for review and accepted medical or scientific conclusions which can be made from these records. Health care providers extensively document their physical examinations, test results, diagnosis and treatment plans. Therefore, it is not unreasonable to allow other competent health care providers to review and explain the medical records and the accepted medical/scientific conclusions that can be made from the records.
In addition, a party may offer testimony about medical and scientific research, such as epidemiology studies. Although there is benefit to the witness having personally performed or participated in relevant studies, the rules of evidence as applied by the Commission do not require that the witness actually performed or participated in a study in order to testify concerning those studies. The qualification of the witness to testify is generally governed by Rule 702 of the North Carolina Rules of Evidence, which requires that the witness be qualified by "knowledge, skill, experience, training, or education" and that the witness's specialized knowledge will "assist the trier of fact to understand the evidence or determine a fact in issue." Once a witness is qualified to render an opinion on a particular subject, Rule 703 allows the witness to base his or her opinion on facts or data reasonably relied upon by experts in the particular field in forming an opinion, even when the particular facts or data are not otherwise admissible. Further, a qualified expert witness may establish that statements in a "learned treatise" are authoritative and thereby admissible as an exception to the hearsay rule under Rule 803.
Accordingly, plaintiff's objections to Dr. Dalton's testimony are DENIED. Dr. Dalton is board certified in the field of occupational environmental medicine, having completed a residency in occupational medicine and holding a masters degree in public health from Johns Hopkins University. The issues in this case are in the arena of occupational medicine, and Dr. Dalton, based on his education and experience, is qualified to render opinions on the subject of occupational medicine. G.S. 8C-1, Rule 702. As a qualified doctor of occupational medicine, Dr. Dalton is entitled to rely on authoritative medical literature and textbooks and to consult with persons with knowledge of information which he would regularly rely upon as a physician of occupational medicine. G.S. 8C-1, Rule 703. Plaintiff's objections are: that Dr. Dalton has never done (bench) research on malignant melanoma, has not treated malignant melanoma since residency, and was not familiar with the chemicals and chemical by-products (outside of a review of MSDS sheets and medical literature), and that he relied on out-of-court statements made by Mr. Smith, an industrial hygienist with defendant-employer. These objections go to the weight of Dr. Dalton's testimony rather than the admissibility of his educated interpretation of accepted scientific research.
Plaintiff's objection to Dr. Goodman's testimony is also DENIED. Dr. Goodman is a physician who is board certified in preventative medicine with an area of expertise in epidemiology and a masters degree in public health. Plaintiff complains that Dr. Goodman has not performed his own research (other than literature research) on malignant melanoma or chemical interactions, has written few publications and none that concern chemical exposure, and that his testimony does not assist the trier of fact. Plaintiff asserts that Dr. Goodman's testimony primarily consists of a review of medical literature and that he has no additional knowledge to share with the trier of fact. As is the case with Dr. Dalton, however, the Commission finds that Dr. Goodman is qualified to testify concerning medical causation, particularly in the field of epidemiology, and that his explanation of the available medical studies assists the trier of fact. Dr. Goodman, therefore, is qualified as an expert witness under Rule 702, and is permitted to testify concerning the applicability of the epidemiology studies in determining whether the employee's malignant melanoma was caused by chemical exposures at his employment with defendant-employer. Plaintiff's challenge, that Dr. Goodman has not treated melanoma and has not personally studied the effect of the chemicals involved in this case, goes to the weight of his testimony. Dr. Goodman's testimony, however, was primarily centered on epidemiology issues and why the trier of fact should not accept Dr. Brautbar's interpretation of the medical literature; Dr. Goodman is qualified as aDaubert witness.
Defendants have also questioned the scientific reliability of the opinion testimony from Dr. Brautbar. Dr. Brautbar is a physician who is board certified in the fields of internal medicine, nephrology, and forensic medicine. Dr. Brautbar testified that his certification in forensic medicine is related to the fields of epidemiology, toxicology, and medical causation. Similar to Dr. Dalton and Dr. Goodman, Dr. Brautbar is not a treating physician and his involvement in the case primarily centered on reviewing the employee's medical records and research of the medical literature to answer questions concerning the association of the employee's potential chemical exposures to his diagnosis of malignant melanoma. Pursuant to Rule 702, Dr. Brautbar qualifies as an expert witness by means of his education, training, and experience, and he is entitled to perform medical literature research and present his interpretation of this research to the Commission. The fact that Dr. Brautbar is not an oncologist and other than benzene has not been involved in the direct study of the chemicals involved in this case goes to the weight of his testimony rather than its admissibility.
The Commission finds that a standard method of differentiating a diagnosis for an injury after a chemical exposure, whether in the form of an accidental injury or an occupational disease, as in this case, is to: (1) determine the nature of the employee's injury or disease (which necessarily includes the performance of reasonable medical tests to confirm or negate potential diagnosis); (2) determine the chemicals or potential chemicals to which the employee was allegedly exposed, and to the extent possible the dose and duration of the exposure; (3) determine the known injuries that can arise from exposure to the chemical(s); (4) compare the employee's diagnosed condition with the type of injuries that are associated with the chemical exposure; and (5) evaluate whether there are other potential causes for the employee's injury, and, to the extent possible, attempt to negate the other potential causes.
If the condition and exposure correlate, there is evidence that the employment exposure might be a cause of the injury. If there are other potential causes for the employee's condition, then the determination of the etiology will require a weighing of the evidence concerning each potential cause. If the known potential injuries from the exposure are excluded, there is no competent evidence to link the symptoms or condition to the exposure. If the accepted medical literature does not accept an association between the chemicals and the disease, the association cannot be created by the educational guess of otherwise qualified expert witnesses. See G.S. § 97-53 (occupational disease by chemicals at work are deemed to be due to work exposures when employment places the employee in sufficient dose and duration of exposure to chemicals which are mentioned in connection with the employee's disease). Supposition and conjecture cannot support causation. Young v. Hickory Business Furniture, 353 N.C. 227,538 S.E.2d 912 (2000), citing Dean v. Carolina Coach Co., 287 N.C. 515,522, 215 S.E.2d 89, 94 (1975); Cummings v. Burroughs Wellcome Co.,130 N.C. App. 88. 91, 502 S.E.2d 26, 29, disc. rev. denied, 349 N.C. 355,517 S.E.2d 890 (1998); Ballenger v. Burris Indus., 66 N.C. App. 556,567, 311 S.E.2d 881, 887, disc. rev. denied, 310 N.C. 743, 315 S.E.2d 700
(1984).
One point on which Dr. Brautbar, Dr. Dalton, and Dr. Goodman appear to agree, and the Commission so finds, is that the mere fact that a particular substance may be associated with cancer is not evidence that this substance would cause a particular form of cancer, such as melanoma. Thus, the relevant inquiry is melanoma, not generic skin cancer or other cancers. The evidence does indicate that the employee had potential exposure to chemical compounds. But neither Dr. Brautbar nor any other witness was aware of the actual exposure and could not identify any report from the EPA, National Institute of Health, OSHA, Department of Health and Human Services or other organization that established a causal link between the suspected chemical exposure(s) and melanoma. The epidemiological and medical studies identified by the expert witnesses do not establish that melanoma is caused or significantly contributed to by the chemicals to which the employee was potentially exposed in his employment with defendant-employer.
Dr. Brautbar's conclusion that the employee was exposed to chemicals which placed him at an increased risk for developing malignant melanoma is not a scientifically and medically sound opinion and does not withstand a Daubert review.
Similarly, Dr. Dalton and Dr. Goodman testified that the currently accepted medical literature does not recognize an association between the employee's potential chemical exposures and the development of melanoma. The Commission accepts this testimony as credible and based on accepted scientific method and studies. Dr. Dalton and Dr. Goodman, however, further expressed that the employee's melanoma was not caused by his employment. This statement is not accepted as competent, because evidence that an association has not been shown to exist does not logically require the conclusion that there is, in fact, no association in this case. The Commission finds that the accepted status of medical science is that there is no known association between the chemicals in question and melanoma.
Accordingly, the Commission sustains plaintiff's Daubert challenge to the testimony and medical records of Dr. Dalton and Dr. Goodman to the extent that they find that the employee's malignant melanoma could not have been caused by environmental conditions at defendant-employer's plant. Similarly, the Full Commission finds that the testimony of Dr. Brautbar, that the employee's work environment placed him at an increased risk for malignant melanoma, is entitled to no weight. These opinions go beyond the status of the accepted medical and scientific knowledge and/or reasonable deduction, are not supported by competent evidence, and thus should not be placed on the scales for determining the greater weight of the credible, competent evidence. See Smith v. Beasley, 148 N.C. App. 559,560 S.E.2d 885 (2002).
To the extent that the foregoing evidentiary rulings contain findings of fact and conclusions of law, they are incorporated as such in this Opinion and Award.
 ***********
Based on the credible evidence of record, the Full Commission makes the following:
 FINDINGS OF FACTS
1. Bobby K. Tomlin ("the employee") was employed by Hoechst Celanese ("defendant-employer") at the Salisbury, North Carolina, plant from 1967 through 1987. After leaving the Salisbury plant, the employee worked for the Stockhausen Chemical plant is South Carolina for approximately a decade. During his employment with employer-defendant, the employee worked as a Process Operator, a Charging Operator, and a Panel Operator in the Staple CP area in the H Building at the Salisbury Plant.
2. The CP or Continuous Polymerization area at the Salisbury Plant is where the raw materials needed to create polyester polymer are brought together and where the creation of the polyester polymer occurs. The process of making polyester polymer occurs when chemicals are mixed together, heated and placed under pressure. This process takes place in a "closed system"[4] containing four connected vessels.
3. In the first vessel or the Primary Estrifier, Ethylene Glycol is mixed with Teraphalic Acid, along with the additives Choline and Lithium, to form a paste and begin the chemical process. These chemicals are added mechanically using an inverta-truck or a hopper. Each chemical is added separately and pumped into the Primary Estrifier by a closed system of lines. The Primary Estrifier is an enclosed vessel which self agitates to mix the chemicals. This vessel is heated by Dowtherm, which is applied to the Primary Estrifier via closed pipes. When the chemicals in the Primary Estrifier react, a vapor is given off. This vapor is cooled and condensed in a tank, all as a part of a closed system.
4. The paste created in the Primary Estrifier is then carried into the second vessel, or Secondary Estrifier, where it is mixed with rework (a pellet form of polyester yarn). In the Secondary Estrifier, the paste is subjected to high pressure in order to thicken the material.
5. The material is then transferred by closed system to the third vessel or Low Polymerizer. In the first stage of the Low Polymerizer, certain chemical additives are fed into the mixture by closed pipelines. These additives are Sandoz, Trimethyl Phosphate, Titanium Dioxide, and Antimony Trioxide. These additives are pumped into the vessel by metering vessels from additive tanks as part of a closed pipeline system. The mixture is in a liquid form in the Low Polymerizer and is heated with Dowtherm (via closed piping and valves) in the second stage of the Low Polymerizer.
6. Finally, the polymer mixture is conveyed into the final vessel or high polymerizer, where finishing takes place. In the final phases, the mixture is agitated with a catalyst under very low pressure to create the desired polymer for polyester yarn.
7. The polyester is then sent to spinning where different finishes are applied depending on what the polyester is to be used for by the customer. On the filament side of the plant, a finish known as T55 is added to the polyester fiber. This would have been done in the K building which is entirely separate from the Staple Area (H Building) where the employee worked at the Salisbury Plant. The K building had its own air conditioning system, such that the air conditioning systems on the filament line would not integrate with the air conditioning for any of the lines on the staple side of the plant.
8. As a Charging Operator, the employee would have had no significant harmful exposure to chemicals. He would have been primarily responsible for going to the elevator, bringing bins full of re-work pellets over to storage bins, properly inverting the re-work bins so they would dump their contents, removing the re-work bins from the storage bins, and putting the re-work bins back on the elevator. Re-work was either off quality yarn or third quality or waste. This yarn would have the same appearance and finish as yarn that was sent to a customer. However, it was compressed into pellet form. The staple area has been monitored for T55 exposure, and company studies reveal that there was no significant exposure to T55 in the staple area.
9. As a Process Operator, the employee would have been primarily responsible for controlling the entry of the various chemicals into the first vessel, the Primary Estrifier. The employee would open valves allowing each chemical to be fed into the vessel by pressurized pump or feed belt. Occasionally, the employee would have poured bags of granulated additive into a hopper that would feed the material through a pipe into the system. The employee would not have been required to actually touch the chemicals as they entered the Primary Estrifier in its regular operation. Monitoring was done in the staple CP area for ethylene glycol, and the monitoring studies showed no risk of injury from exposure to ethylene glycol. Teraphalic acid levels were monitored to ensure that they remained below the OSHA limits for nuisance dust. All monitoring reports indicated levels below OSHA limits. There was no significant risk for exposure for people who worked in the process area for teraphalic acid. The additives pentirithithal and adipic acid were also monitored as potential nuisance dusts, but also always remained below the OSHA limits. The additive, Choline, was not a controlled chemical, and as such was not monitored. Lithium, another additive, was used in a form that could not have caused exposure, since it was received in liquid form and was introduced into a closed system. Lithium was introduced into the system prior to the employee's work station. Also, one would have to drink or ingest lithium, in its liquid form, for an exposure to occur. As such, the employee was not significantly exposed to any harmful chemicals in his work as a Process Operator.
10. As a Panel Operator, the employee was primarily responsible for watching gauges in a panel room and making sure chemicals were in the proper ratio. The employee would take a viscometer sample of the finished fiber down to a lab, fill out paperwork and leave the sample for the lab. There is no evidence the employee was exposed to harmful chemicals while fulfilling his duties as a Panel Operator.
11. The primary causes of melanoma, as all experts testified to in their depositions, are exposure to ultraviolet light and the presence of moles or nevi. The employee was raised in North Carolina. The employee had a mole above his knee on his right leg for a long time, or as long as his wife could remember.
12. In 1975, the employee was diagnosed with melanoma at the site of the aforementioned mole on his right leg. According to stipulated medical records and the testimony on Roberta Tomlin, the entire mole and the tissue surrounding the mole were removed by Dr. Nicholas Georgiade at Duke University Medical Center. The employee continued to follow-up with Dr. Georgiade without incident until 1981.
13. In April of 1981, the employee had a recurrence of metastatic melanoma in his right groin area. This melanoma was surgically removed by Dr. Georgiade. Following his surgery, physicians at Duke University Medical Center administered immunotherapy. The employee was monitored by these physicians through 1983.
14. In November 1996, Dr. Loggie at Baptist Hospital diagnosed the employee with primary melanoma in his right knee area. Dr. Loggie also found that the employee had a lesion in the pons region of his brain. The employee had two nodules on his knee removed in early 1998 and was treated with interferon. By August 1998, the employee was healing nicely with no evidence of a recurrence of malignant melanoma, and he was declared to be in clinical remission by Dr. Hopkins at Piedmont Hematology-Oncology Associates.
15. In May 1999, the employee returned to Duke University Medical Center due to chest pain. He was diagnosed with pulmonary metastasis with suspected brain metastasis. An MRI of the employee's brain showed three lesions. The employee continued to treat with Dr. Hopkins and with the doctors at Duke University Medical Center until his death on August 4, 1999.
16. The greater weight of the competent medical evidence is that the employee's malignant melanoma was caused by natural factors. There is insufficient competent evidence to determine that the employee's melanoma is related to his work environment. All of the experts that testified agreed that the most common cause of a melanoma is sun exposure at an early age such as childhood. Plaintiff's expert, Dr. Brautbar, testified that ultraviolet radiation (sunlight) was the most frequently identified cause for the development of melanoma. The employee's melanoma, more likely than not, developed due to early childhood exposure to the sun or due to idiopathic cause.
17. All of the experts testified that moles and nevi place a person at an increased risk for the development of melanomas. According to the medical records, the employee had multiple nevi, including nevi located on his right knee, left upper abdomen, left chest, left nasolabial fold, and the right eyelid. In 1975, the employee went to the hospital for kidney stones and at that time requested removal of the right knee mole. It was then that the employee was first diagnosed with a melanoma, and that diagnosis was related to and found at the site of the mole removed from the employee's right knee. This mole existed when the employee got married and before he went to work for defendant-employer. Thereafter, the employee had a recurrence of the right knee melanoma in 1996 and a recurrence in 1981 on the upper right lung. The growth reappeared at the employee's right knee at the same spot as the prior surgery, at the location of the mole removed in 1975. The employee's mole predated his employment with Hoechst Celanese and, thus, could not have been caused by chemical exposure. The employee's melanoma, located at the site of the mole, is more likely than not related to the natural risk factors of abnormal pigmentation that goes along with moles and nevi.
18. Although all the experts who testified in this case recognized that moles and nevi place an individual at an increased risk for developing melanomas, Dr. Brautbar downplayed the employee's multiple nevi based upon his belief that the employee developed his melanomas at sites other than where the employee had moles or nevi. This assumption, as presented in question by plaintiff's counsel, is incorrect and contrary to the employee's medical records. Ms. Tomlin's testimony and the employee's medical records indicate that the first melanoma occurred at the site of a pre-existing mole. The medical testimony recognizing the increased risk for melanomas at mole sites, along with the fact that the employee's first melanoma occurred at the site of a pre-existing mole, and its ultimate recurrence at approximately the same spot on the right knee, is indicative of a natural causative factor.
19. Additional evidence that the employee's melanoma was caused not by work factors, but by sun exposure and natural or unknown factors, is the latency period for melanoma. According to Dr. Brautbar, the latency period between exposure to sunlight and the development of a melanoma is between 5 to 14 years. Assuming a latency period of 5 to 14 years for sun exposure, the following time line is significant: the employee was born on April 5, 1948, and would have been 10 years old in April of 1958, 15 years old in April of 1963, and 19 years old in 1967, around the time he married Ms. Tomlin. He was 27 years old in 1975 when first diagnosed with melanoma. Based upon Ms. Tomlin's testimony, the employee had the right knee mole in the late 1960's when they got married and prior to his employment with Hoechst Celanese. This time line would be more consistent with sun exposure causing melanoma than employment with Hoechst Celanese. By subtracting 5 to 14 years from the date the mole was first known to be present, 1967, places the employee's injurious exposure between 1953, when he was approximately 5 years old, to 1962, when the employee was 14 years old. This is the early childhood sun exposure most common for the development of a melanoma.
20. In contrast, Dr. Brautbar testified that there is no medical information concerning the latency period for chemical exposure and melanoma, which fact is consistent with the opinions of the other experts that there currently is no accepted scientific association between melanoma and the chemicals in question in this case.
21. At the deputy commissioner hearing, defense counsel and the deputy commissioner asked plaintiff's counsel to identify what specific chemical was alleged to have caused the development of the employee's melanoma. The response was that general chemical exposure at the Hoechst Celanese facility caused or contributed to the development of the employee's melanoma. Plaintiff appears to contend that, because some chemicals utilized in the Hoechst Celanese facility are known to be carcinogenic, the employee's melanoma was caused by chemical exposure.
22. Dr. Marsha Dean Ford testified that she is not aware that any of the specific chemicals in this case have been shown to cause melanoma. Dr. Ford is a medical doctor board certified in the fields of Internal Medicine, Emergency Medicine, Medical Toxicology, and with a special qualification in Medical Toxicology by the American Board of Emergency Medicine. She is the Director of Toxicology and the Medical Director for the Poison Control Center of the Carolinas Medical Center located in Charlotte, North Carolina, which is the official poison control center in this state. Dr. Ford has studied ethylene glycol which is one of the substances used at defendant-employer's plant. Dr. Ford reviewed the employee's medical records, the MSDS sheets for the materials used at the plant, 13 journal articles that were submitted for review, reports from defendant-employer's plant, Brautbar's report including abstracts of articles supplied by Dr. Brautbar, and performed a standard toxicological examination of medical textbooks, monographs, and computer research on International Agency for Research on Cancer, 9th Report on Carcinogens 2000, and Medline and Toxline database searches for melanoma and the chemicals at issue. Having performed this investigation, Dr. Ford testified that she was not aware of any literature that links any of the chemicals to melanoma. Dr. Ford's ultimate conclusion was that "more likely than not" there was no causal link between the alleged chemical exposures and the subsequent development of melanoma in Mr. Tomlin.[5]
23. Dr. Ford's report and testimony is also enlightening concerning the validity of using the studies relied on by Dr. Brautbar and whether they support the proposition that chemical exposure could have caused the employee's melanoma. Dr. Ford's report details:
 "The studies in the literature have conflicting results, with some finding an increased risk for melanoma in workers exposed to chemicals while others finding no increased risk. There are numerous problems with these studies: a) exposure to ionizing radiation, strongly linked to the development of melanoma is not controlled for; b) identities of the specific chemicals are seldom elicited or documented, making it impossible to identify a specific causal agent, if one does indeed exist; 3) [sic] the study designs usually rely upon case control design and examine standardized mortality ratios (SMRs). Pitfalls of these studies include small numbers of workers (of note, the studies with larger numbers of subjects do not support an increased incidence of melanoma)[sic], having to rely on past recall for information on past exposures, not being able to control for extraneous variables (such as the example of ionizing radiation given above), and difficulty in selecting an appropriate comparison group as well as one of sufficient size. . . . In summary, none of these studies has sufficient rigor of design or detail to establish a causal link between chemical exposure and melanoma."
Dr. Ford's testimony and report, consistent with other expert opinion in this case, indicates that some of the studies, at most, suggest that a correlation between chemical exposures and melanoma should be investigated; however, there is no accepted link between chemical exposure and melanoma. This conclusion is consistent with the IARC 9th Report on Carcinogens 2000 and other accepted sources which fail to classify the chemicals at issue as a causal factor for melanoma.
24. Dr. Ford's opinion was further supported by Dr. Dyson with Workplace Hygiene in Greensboro, North Carolina. Dr. Dyson holds a Ph.D. in Environmental Health Engineering, an M.S. in Environmental Health Engineering, and a B.S. in Chemical Engineering. Dr. Dyson has been around polyester fiber facilities since 1966 and has personally inspected the Hoechst Celanese plant at issue in this litigation. Dr. Dyson, as an Industrial Hygienist, looks at workplace environments to see if there is any health hazards present in those workplace environments. Dr. Dyson stated at his deposition that, in his opinion, the employee's work environment most likely was not the cause of the development of melanomas in this case.
25. In addition, Dr. Bruce Dalton, a licensed Medical Doctor who is Board Certified in Occupational and Environmental Medicine and who is an Associate Professor at Duke University Medical Center, testified that it is highly improbable that the employee's occupational environment or potential chemical exposures during his employment at Hoechst Celanese contributed in any way to his malignant melanoma. Rather, the employee's malignant melanoma resulted from spontaneous malignant transformation of melanocytes in an existing mole.
26. Dr. Goodman, a Board-Certified Epidemiologist, reaffirmed these sentiments, based upon his review of epidemiological studies examining occupational exposures to chemicals. According to Dr. Goodman, epidemiological studies do not support the proposition that chemical exposure in the fiber industry has any causal relationship to the development of melanoma.
27. Plaintiff rests her case on the testimony of Dr. Brautbar. Dr. Brautbar admits that simply because a chemical is listed as a known carcinogen, it is not synonymous with it causing melanoma. Dr. Brautbar further recognized that just because a chemical is labeled as "carcinogenic" does not mean that the chemical has the capacity of causing multiple, different cancers. Despite conceding these factors, Dr. Brautbar suggests that, because some of the chemicals that the employee may have been exposed to (particularly benzene, arsenic, and a component of T-55) are known to be mutagenic or carcinogenic, this is evidence that they caused the employee's melanoma. As expressed above, such an abstraction is not logical, is a non sequitur, and is not supported by medical science; therefore, Dr. Brautbar's ultimate conclusion amounts to speculation and conjecture.
28. The lack of a correlation between exposure to chemicals at the defendant-employer's plaint and death from melanoma is supported by a study performed by Epidemiology Resources, Incorporated (hereinafter known as "EPI"), a private company and one of the main consulting companies for epidemiology in the United States. This organization conducted a study in 1992 of the Hoechst Celanese Salisbury plant relating to chemical exposure and cancer risks. This Report was submitted for peer review in 1994 and was published in the AmericanJournal of Industrial Medicine. Subjecting a study to peer review and publication is one of the four non-exclusive indicators of scientific reliability as recognized by the United States Supreme Court in theDaubert decision. This 1992 cohort study included 8,878 workers who were employed at the Hoechst Celanese Salisbury plant between November 1, 1965, and December 31, 1988. The employee worked from 1967 to approximately 1983, which makes the study relevant to his work history. Deaths were identified using a National Death Index, pending benefit information and mortality registries maintained by EPI. Death certificates were coded by a professional nosologist. The expected number of deaths was computed using age, race, and gender-specific annual mortality rates for the United States population.
29. According to Dr. Goodman, an epidemiologist who has never worked for EPI, the 1992 study was conducted according to accepted canons of academic epidemiology. EPI discerned a large cohort, followed the cohort for a specific period of time (twenty-three years), calculated Standardized Mortality Ratios ("SMRs") for various cancers, and conducted case controls. This study was not conducted by the employees of Hoechst Celanese, but by a reputable independent company and is a highly reliable study. The study, however, was funded by Hoechst Celanese.
30. As a result of this study, no association between the employee's work environment and the development of melanomas or cancers was found to exist. In all, a total of 150 cancer deaths were identified with a Standard Mortality Ratio for all cancer deaths of 0.92. Of that number, four (4) deaths were noted to have occurred from melanoma with an approximate 3.3 expected, yielding a non-significant SMR of 1.23 and a confidence limit of .34 to 3.16. (EPI Report 1992.) The study concluded that there was no association between alleged chemical exposure and melanoma at the defendant's Salisbury plant. Even Dr. Brautbar, the employee's expert witness, admitted that the 1992 EPI study did not find any significant increase in melanoma cases at the Hoechst Celanese Salisbury facility.
31. In addition to the 1992 study, which was peer reviewed in 1994, a study was conducted at a Hoechst Celanese facility in Canada relating to the component of T-55. That study also showed no relationship between the component of T-55 finish and melanoma. In addition, Dr. Goodman, Dr. Dalton, Dr. Dyson, and Dr. Ford were not aware of a single study that showed textile or fiber industry workers were at an increased risk for the development of melanoma.
32. Dr. Brautbar relied on studies which he suggests shows an increased risk of melanomas for chemical workers and petrol chemical workers. When asked to define the occupations in those studies, Dr. Brautbar indicated that chemical workers consisted of chemists or people doing chemistry in a chemical processing environment, which is a different environment from defendant-employer's polyester plant. Dr. Brautbar also readily admitted that the petrol chemical industry was different than the polyester industry. Ultimately, Dr. Brautbar indicated that these studies were relevant because the employees in the studies, like the employee, may have been exposed to benzene, arsenic, and the components of T-55. These chemicals, however, are not listed as causing melanoma on any known registry. Arsenic and benzene are known carcinogenic agents, and a component of T-55 is known to be mutagenic. However, even Dr. Brautbar admits that simply because something is known to cause cancer in one organ system does not support the proposition that it causes another type of cancer, or a cancer in another organ system. Thus, there is no accepted scientific basis to Dr. Brautbar's opinion that these three chemicals placed the employee at an increased risk for developing melanoma. Furthermore, the hearing testimony does not support an exposure to arsenic and benzene, and only a limited exposure to T-55, that being the reworked polyester pellets, and it appears that the T-55 was used after the employee was initially diagnosed with and treated for melanoma. Thus, Dr. Brautbar's ultimate conclusion is not accepted as credible. In the event it may be determined by a higher Court that the Commission has erred in its application of Daubert, for the expressed reasons Dr. Brautbar's testimony is found unpersuasive.
33. The greater weight of the credible evidence is that there is no known association between chemical exposure, particularly for the chemicals identified in this case, and the development of melanoma. The Full Commission therefore concludes that plaintiff has failed to establish that the employee's disease, melanoma, was caused or significantly contributed to by his employment or that his employment placed him at a greater risk of contracting melanoma than the general public not so employed. Melanoma is an ordinary disease of life and the employee has not established that it is more likely than not that his disease was caused by his employment with defendant-employer.
 ***********
Based on the foregoing Stipulations and Findings of Facts, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff has failed to show that the employee sustained a compensable occupational disease. G.S. § 97-53(13).
2. The medical causation of the employee's melanoma and his alleged chemical exposure at work with defendant-employer is a complex medical question requiring competent expert medical testimony. The Supreme Court of North Carolina held in Click v. Pilot Freight Carriers, Inc.,300 N.C. 164, 265 S.E.2d 389 (1980), that, in the absence of guidance by expert opinion, the Commission could only speculate on the probable cause of the employee's condition. Competent medical testimony is required to provide the proper foundation. Click at 392. Moreover, it is well settled that expert testimony that is founded on "speculation" is not competent evidence upon which to base a decision. Young v. HickoryBusiness Furniture, 353 N.C. 227, 538 S.E.2d 912 (2000); Ballenger v.Burris, 66 N.C. App. 556, 567, 311 S.E.2d 881, 887, disc. review denied,310 N.C. 743, 315 S.E.2d 700 (1984); Smith v. Beasley Enterprises,148 N.C. App. 559, 560 S.E.2d 885 (2002) (ordered published 3/20/02). The employee rests his entire case for causation upon the expert testimony of one medical expert who bases his opinion on mere speculation and non sequitur. Therefore, the employee cannot prevail.
 ***********
Based on the foregoing Findings of Facts and Conclusions of Law, the Full Commission makes the following:
 AWARD
1. Plaintiff's claim for benefits is hereby DENIED.
2. Each side shall pay its own costs.
This the ___ day of May 2002.
 S/______________ RENE C. RIGGSBEE COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
DISSENTING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
RCR/gas
[1] Plaintiff also suggested in the deposition of Dr. Seigler that he was not designated as an expert witness; however, this objection was not raised on appeal and no evidence was presented to the Full Commission to determine whether Dr. Seigler was appropriately noticed for deposition as an expert witness. Therefore, the Full Commission finds that plaintiff has waived this objection to Dr. Seigler's deposition.
[2] Rule 702(a) provides:
"If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion."
[3] The Commission uses the phrase "Daubert witness" to refer to a witness whose testimony is presented to establish that another witness' opinion is not scientifically reliable. The Daubert witness may also be an expert witness as to the nature of the medical condition, treatment, causation, or other issues, or his testimony may be limited to providing evidence relevant to determining whether an opinion is scientifically acceptable or based on conjecture, speculation, or possibility.
[4] The term "closed system" refers to the process occurring in a system of pipes and vessels that are intended to reduce exposure to potentially harmful chemicals, maintain the integrity of the product, and allow for the necessary chemical reaction(s) to produce the desired process. A closed system is the opposite of an "open air" process where the product is manufactured in the open environment. Through the use of the term "closed system" in this Opinion, the Commission does not suggest that there never were any leaks or potential contact with the substances in the closed system. Under the state of the evidence in this case the actual exposure to deceased employee and to what substances, at what dose, and for what duration is unknown.
[5] The Full Commission notes that plaintiff has not made a Daubert
objection to the testimony of Dr. Ford. Consistent with the prior findings concerning Dr. Dalton and Dr. Goodman, the Full Commission finds that the status of accepted medical science is that there is no known association between the alleged chemical exposure and melanoma, which is in accordance with Dr. Ford's statement that it is "more likely than not that there is no causal link between these chemical exposures and the subsequent development of melanoma in Mr. Tomlin."